**INNOVATIVE HEALTH SYSTEMS, INC., Martin A., Maria B. and John Does Nos. 1–3, Plaintiffs,**

v.

**The CITY OF WHITE PLAINS, S.J. Schulman, Mayor of the City of White Plains, the Zoning Board of Appeals of White Plains, Terrence Guerriere, Chair of the Zoning Board of Appeals of White Plains, White Plains Planning Board, Mary Cavallero, Chair of the White Plains Planning Board, Defendants.**

**No. 95 CV 9642 (BDP).**

United States District Court, S.D. New York.

June 12, 1996.

proved unnecessary because the record contained substantial evidence to support his findings.

Susan L. Jacobs, Sally Friedman, Legal Action Center of the City of New York, New York City, for Plaintiff.

Maya Wiley, James Cott, Asst. U.S. Attys., New York City, for U.S.

Richard S. Oelsner, Richard Elbert, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, John G. Callahan, Corporation Counsel's Office, City of White Plains, White Plains, NY, for Defendants.

### MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

Plaintiff Innovative Health Systems, Inc. ("IHS") is a certified New York State treatment program for individuals with alcohol and drug dependency. Plaintiffs Martin A. and Maria B. are current clients of IHS. Plaintiffs John Does 1–3 are yet-to-be-identified prospective clients of IHS.

The plaintiffs commenced this action against defendants City of White Plains, New York, S.J. Schulman, Mayor of the City of White Plains, the Zoning Board of Appeals of White Plains ("ZBA"), Terrence Guerriere, the past Chair of the ZBA, the White Plains Planning Board, and Mary Cavallero, the Chair of the White Plains Planning Board, alleging that defendants violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, by refusing to permit IHS to operate its treatment program in downtown White Plains. Before this Court are plaintiffs' motion for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and defendants' motion to dismiss the complaint, pursuant to Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure. The United States Department of Justice filed a brief as amicus curiae in opposition to defendants' motion to

dismiss. For the reasons set forth below, plaintiffs' motion for a preliminary injunction is granted. Defendants' motion to dismiss is granted in part and denied in part.

## FACTS

The following facts are alleged in the complaint and therefore assumed to be true for purposes of defendants' motion to dismiss. Since 1985, IHS has operated at 7 Holland Avenue on the outskirts of White Plains. In January 1994, IHS leased the first floor of a building known as 33 South Broadway in downtown White Plains. A separate part of the building, with no shared space or common areas, is used for residential purposes and is known as Cameo House. The building is in a BR–4 zoning district, which is a high density, mixed use zone, permitting a combination of "retail, office, governmental, and service business uses appropriate for the role of the City as a regional center, in addition to encouraging high density housing in combination therewith." Zoning Ordinance § 5.5.1.9.

In April 1994, IHS filed an application with the White Plains Department of Building for a building permit to renovate the southerly portion of 33 South Broadway. Because the southerly portion had previously been used as a retail furniture store, the Planning Board's approval of IHS' change of use was required. Thus, the Commissioner of Building referred IHS' change of use application to the Planning Board for site plan approval as required by § 7.2.2 of the Zoning Ordinance. On May 3, 1994, the Deputy Commissioner of Building informed the Planning Board that the Commissioner had concluded that IHS' proposed use of the South Broadway site for its alcohol and drug treatment program was a permitted "office" use in that location.

IHS' application precipitated opposition from Cameo House Owners, Inc., a co-operative association representing resident owners of Cameo House, from Fashion Mall Partners, L.P., the owner of "The Westchester," and from other members of the community (collectively "certain members of the community"). On May 11 and June 8, 1994, the Planning Board held public meetings about IHS' proposed use, at which certain members of the community objected to the "condition and appearance" of IHS' client base, and expressed concern that a treatment program would depress the market value of their apartments. In addition, they argued that a treatment program should not be considered a business/professional office but, rather, a "clinic" falling within the Zoning Ordinance's definition of "hospitals or sanitaria," which is not a permitted use in the BR–4 zoning district in which the building is located. Zoning Ordinance § 6.7.5.1.

The Planning Board requested the Commissioner of Building to reconsider his determination that IHS' proposed use was a permitted "office" use. On July 21, 1994, the Commissioner reaffirmed his previous determination. In August 1994, however, IHS withdrew its change of use application, because of the opposition from certain members of the community to its plans "and the delay and mounting costs resulting from the Planning Board's review of [its] . . . application."

On August 9, 1994, IHS applied to the Commissioner of Building for a building permit to renovate the northerly portion of the leased premises, which had previously been used as offices, and thus, already had the necessary use approval from the Planning Board. In September and October 1994, the opponents submitted letters to the Commissioner of Building and to the Mayor opposing IHS' proposed use. On October 26, 1994, Mary Cavallero, Chair of the Planning Board wrote a memorandum to the Commissioner of Building expressing the Planning Board's opposition to locating IHS' treatment program in the building. The Commissioner of Building requested the White Plains Corporation Counsel to review IHS' proposal and the Commissioner's own conclusion that IHS' program was a permitted use. After being advised of the Corporation Counsel's legal opinion, the Commissioner of Building issued a determination, in a letter dated December 14, 1994, that IHS' proposed use "is considered an office use."

On December 19, 1994, the Corporation Counsel issued a written legal opinion to the Commissioner of Building. The opinion concluded that "it is our opinion that your inter-

pretation is correct and that the proposed use may be permitted in the chosen location." The Corporation Counsel rejected the argument of certain members of the community that the treatment program should be deemed a "clinic" as unpersuasive: "opponents have fixated on the word 'clinic,' but have ignored the initial part of the definition." On January 23, 1995, the Department of Building issued a building permit for IHS to renovate the space.

On December 27, 1994, Cameo House Owners and Fashion Mall Partners appealed the Commissioner of Building's determination to the ZBA. From April 5 through May 3, 1995, the ZBA conducted a public hearing pursuant to § 10.4.3 of the Zoning Ordinance. The complaint alleges that the testimony and written statements from certain members of the community during this hearing reveal that the basis of their objections to the siting of the IHS treatment program was bias against, and hostility towards, IHS' clients,—individuals seeking treatment for alcohol and drug dependency.

On July 5, 1995, allegedly without legal explanation, the Zoning Board voted 4–1 to reverse the prior determinations of the Commissioner of Building that IHS' treatment program was a permitted "office" use. The record of the ZBA's vote contains ZBA members' statements that, because IHS provides outpatient counseling and related services, its treatment program is to be considered a "hospitals or sanitaria" use. The complaint alleges, however that other counseling services and outpatient medical care facilities are permitted to operate in the BR–4 zoning district, and have not been categorized as "hospitals or sanitaria."

For example, counseling activities are conducted in psychiatrists and social workers' offices on the first residential floor of Cameo House. The Health Insurance Plan of Greater New York operates a medical facility at 15 North Broadway, a few blocks from IHS' new site and within the same BR–4 District.

In addition, the complaint alleges that according to newspaper reports, defendants are permitting the Veterans Administration to site a satellite medical clinic in the same BR–4 district.

Plaintiffs seek declaratory, injunctive and monetary relief under the ADA and the Rehabilitation Act for alleged discrimination and failure to make reasonable modification to policies and practices or to accommodate reasonably their disability.

Defendants oppose plaintiffs' motion for a preliminary injunction and move to dismiss the complaint on the grounds that (1) plaintiffs' claim, based upon a zoning ordinance, is not within the scope of either the ADA or the Rehabilitation Act; (2) plaintiffs lack standing; (3) plaintiffs have not alleged any facts stating a claim against the City, Mayor Schulman, the Planning Board, or Mary Cavallero; (4) neither the ADA nor the Rehabilitation Act requires defendants to accord preferential treatment to plaintiffs; and (5) plaintiffs have failed to demonstrate a likelihood of success on the merits and irreparable harm.

### A. *Defendants' Motion to Dismiss*

1. *Whether plaintiffs' claim, based upon a zoning ordinance, is within the scope of the ADA and the Rehabilitation Act*

 a. *"Services, programs or activities" under the ADA*

Section 12132 of the ADA provides,

[s]ubject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.[1] "Disability" is defined as "a physical or mental impairment that substantially limits one or more of the major

---

1. The Rehabilitation Act provides that "[n]o otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794.

life activities of [an] individual." 42 U.S.C. § 12102(2)(A). Persons recovering from or receiving treatment for addiction to alcohol or drugs are disabled individuals for purposes of the ADA and § 504 of the Rehabilitation Act. 42 U.S.C. § 12210(b) and (c); 28 C.F.R. §§ 35.104, 35.131 (ADA); 29 U.S.C. § 706(8)(B) and (C) (Rehabilitation Act); *Collings v. Longview Fibre Co.*, 63 F.3d 828, 831 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 711, 133 L.Ed.2d 666 (1996); *Sullivan v. City of Pittsburgh*, 811 F.2d 171, 182 (3d Cir.), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987); *Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450, 459 (D.N.J.1992).

Citing *Burnham v. City of Rohnert Park*, 1992 WL 672965 (N.D.Cal.), *Moyer v. Lower Oxford Township*, 1993 WL 5489 (E.D.Pa.), *Oxford House, Inc. v. City of Albany ("Oxford House II")*, 155 F.R.D. 409 (N.D.N.Y. 1994), *Kessler Inst. for Rehabilitation, Inc. v. Mayor and Council of Essex Fells*, 876 F.Supp. 641 (D.N.J.1995) and *Robinson v. City of Friendswood*, 890 F.Supp. 616 (S.D.Tex.1995), defendants argue that zoning is not a service, program or activity provided by a public entity. Defendants additionally argue that because the ADA is similar to the Rehabilitation Act, *see Doe v. Univ. of Maryland Medical Sys. Corp.*, 50 F.3d 1261, 1267 n. 9 (4th Cir.1995), the same analysis precluding coverage in the context of zoning would apply to the Rehabilitation Act.

This case law, however, is inconclusive on whether the ADA applies to zoning decisions. In most of the pertinent cases, as the courts expressly note, the issue was not adequately briefed. And, in resolving the issue, none of these courts analyzed the language of the ADA or its legislative history.

In a footnote that was clearly dicta, *Burnham* set the precedent. In *Burnham*, the plaintiff sought a preliminary injunction requiring the defendant city to allow her to continue to live in a mobile home parked in a driveway in a residential district, in violation of local ordinances. The court denied the motion on the basis that the plaintiff had not demonstrated a likelihood that she would succeed in proving that the defendant had discriminated against her on the basis of her

handicap and because she failed to demonstrate irreparable harm. In a footnote, the court, without analysis or citation to authority, also stated that the plaintiff's ADA claim had "other problems": "the ADA prohibits discrimination in the distribution of public services, programs, or activities. No such public programs are at issue here." *Burnham*, 1992 WL 672965 at *5 n. 9.

The first case in which the issue actually arose was *Moyer. Moyer,* however, relied exclusively on *Burnham.* Without analysis, it held that the ADA does not apply in the zoning context. It specifically noted, however, that the plaintiff did not cite any authority to the contrary. *Moyer*, 1993 WL 5489 at *2.

That same year, *Oxford House, Inc. v. City of Albany ("Oxford House I")*, 819 F.Supp. 1168 (N.D.N.Y.1993), granted the defendant city's motion to dismiss claims arising out of the ADA, on the grounds that zoning regulations were not covered by the ADA. In *Oxford House II,* however, the plaintiffs moved for reconsideration of the court's order. In ruling on the motion, the court noted that its determination was based upon *Burnham* and *Moyer.* It "highlighted" the fact that "plaintiffs, in their opposition papers to defendants' motion to dismiss, had completely failed to cite to any authority indicating that the ADA should be applied to a zoning context." *Oxford House II*, 155 F.R.D. at 410. In denying the motion for reconsideration, however, the court recognized that plaintiffs' arguments for reconsideration, based on the legislative history of the ADA and its interpretation by the Justice Department, were "legitimate," but were merely "brought forth too late." *Oxford House II,* 155 F.R.D. at 411.

Next, *Kessler,* also without analysis or citation to any authority, dismissed an ADA claim, stating only that "[a] zoning amendment. . . . is not a public service, program, or activity." *Kessler,* 876 F.Supp. at 655.

Finally, *Robinson* specifically noted that "there is limited authority on the nature and extent of the applicability of the ADA, a recently enacted statute, to zoning." *Robinson*, 890 F.Supp. at 623. It thus relied upon *Burnham, Moyer,* and *Oxford House* to hold

that the ADA did not apply to zoning, but rather was directed toward areas of employment and places of public accommodation. *See Robinson,* 890 F.Supp. at 619–20, 623.

The most recent case relying upon this line of authority is *United States v. City of Charlotte,* 904 F.Supp. 482 (W.D.N.C.1995). Citing *Burnham, Moyer* and *Oxford House II,* it held that zoning did not fall within the plain meaning of the terms "service," "program," or "activity," and thereby dismissed the plaintiff's ADA claims.

■ I respectfully disagree with *City of Charlotte* and the cases upon which it relies. "Activity" is defined by *Webster's Third New International Dictionary* (1993) as a "natural or normal function or operation." Because zoning is a normal function or operation of a governmental entity,[2] the plain meaning of "activity" clearly encompasses zoning.

■ Moreover, I find nothing in the text or legislative history of the ADA to suggest that zoning or any other governmental activity was excluded from its mandate. Congress enacted the ADA to eliminate pervasive discrimination against individuals with disabilities, having determined that "historically, society has tended to isolate and segregate individuals with disabilities." 42 U.S.C. § 12101(a)(1). The purpose of the ADA was to establish "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1). "As a remedial statute, the ADA must be broadly construed to effectuate its purpose." *Civic Ass'n of the Deaf v. Giuliani, et al.,* 915 F.Supp. 622, 633 (S.D.N.Y.1996).

Accordingly, the ADA's language is broad: it protects individuals with disabilities from being "denied the benefits of the services, programs, or activities of a public entity, or [from] be[ing] subjected to discrimination by

any such entity," 42 U.S.C. § 12132. There is no suggestion in the statute that zoning or any other type of public action is to be excluded from this broad mandate. Moreover, the last phrase of Title II's prohibition is even more expansive, stating simply that no individual with a disability may be "subjected to discrimination" by a public entity.

The legislative history of the ADA confirms that it was intended to sweep widely. The House Report states that, in Title II,

[t]he Committee has chosen not to list all the types of actions that are included within the term 'discrimination,' as was done in titles 1 and 111, because this title essentially simply extends the antidiscrimination prohibition embodied in section 504 [of the Rehabilitation Act] to all actions of state and local governments.

H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 303, 367. The House Report later emphasizes the broad coverage of Title II, stating: "Title II of the bill makes all activities of State and local governments subject to the types of prohibitions against discrimination against qualified individuals with a disability included in section 504 (nondiscrimination)." *Id.* at 151, *reprinted in* 1990 U.S.C.C.A.N. at 434. *See also* 134 Cong.Rec. 9606, E1308 (April 29, 1988) (Coelho).

■ Consistent with Title II's broad language and its legislative history, the Department of Justice, in its Title II implementing regulations and other Title II analyses, has interpreted Title II to reach all actions by public entities, including zoning enforcement actions.[3] The regulations enumerate several categories of specific activities that constitute discrimination by public entities. 28 C.F.R. § 35.130. One of these specific provisions requires public entities to make reasonable modifications to their poli-

2. A "public entity" includes "any State or local government," 42 U.S.C. § 12131(1)(A), and "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B); 28 C.F.R. § 35.104. For purposes of the ADA, the City of White Plains, the Zoning Board of Appeals and the Planning Board are "public entities."

3. The Department of Justice's regulations are entitled to controlling weight unless they are "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). There is nothing to suggest that the regulations here are arbitrary, capricious or manifestly contrary to the statute.

cies, practices, and procedures, where such modifications are necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7). Zoning enforcement actions, including the enactment of ordinances, and any administrative processes, hearings, and decisions by zoning boards, fall squarely within the category of "policies, practices, or procedures" mentioned in the regulations.[4]

Section 504 of the Rehabilitation Act also contains expansive language prohibiting discrimination on the basis of disability in any "program or activity" of recipients of Federal financial assistance. 29 U.S.C. § 794 (1988 & Supp. IV 1992). The Civil Rights Restoration Act made clear that "the term 'program or activity' and 'program' means all of the operations of [a recipient of federal funding]." 29 U.S.C. § 794. Neither the Rehabilitation Act nor the Civil Rights Restoration Act, nor their legislative histories, contain any indication of a congressional desire to exempt zoning enforcement from their coverage.[5]

Finally, in contrast to the cases relied upon by defendants, other courts have held that the ADA does apply to zoning, sometimes after relatively more extensive analysis. *See, e.g., Musko v. McClandless,* 1995 WL 262520 (E.D.Pa. *6); *Oak Ridge Care Ctr. v. Racine County,* 896 F.Supp. 867 (E.D.Wis.1995); *Pack v. Clayton County,* No. 1:93–CV–836– RHH, 1993 WL 837007 (N.D.Ga., Aug. 27, 1993), *aff'd,* 47 F.3d 430 (11th Cir.1995). In addition, the only case to address the question in terms of the Rehabilitation Act held that the Act applied to claims of discrimination in zoning. *See Sullivan,* 811 F.2d at 182–83.

### b. *Federal Financial Assistance under the Rehabilitation Act*

The Rehabilitation Act applies to discrimination by recipients of Federal financial assistance only. *See Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 722 (2d Cir.1994), *cert. den.,* —— U.S. ——, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). Plaintiffs have alleged that the "City is a recipient of federal financial assistance." Complaint ¶ 100. Defendants argue that because plaintiffs have not

---

**4.** Moreover, the Department of Justice's preamble to the regulations explains that "Title II applies to anything a public entity does.... All governmental activities of public entities are covered...." 28 C.F.R. pt. 35, App.A at 441–42. In addition, the Title II TA Manual specifically uses zoning in an illustration of a public entity's obligation to modify its policies, practices, and procedures. *See* TA Manual § II–3.6100 at 14. The TA Manual also makes clear that Title II reaches local laws and ordinances generally. *See* TA Manual § II–8.1000 at 44. The Department of Justice's preamble and Title II Technical Assistance Manual interpreting its regulations are entitled to controlling weight unless they are "plainly erroneous or inconsistent with the regulation[s]." *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, ——, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994). There is nothing to suggest that the preamble or the TA Manual here are plainly erroneous or inconsistent with the regulations.

**5.** Construing Title II to cover zoning is consistent not only with the Rehabilitation Act, but with other related civil rights laws, most notably the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* (1988 & Supp. IV 1992). Like Title II, the Fair Housing Act bars discrimination by using broad, general language. Noting Congress' use of expansive language, courts have interpreted the Fair Housing Act's general statutory language to cover local zoning decisions, even though zoning was not specifically mentioned in that Act. *See, e.g., LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412,

424 (2d Cir.1995), *petition for cert. filed,* 64 U.S.L.W. 3605 (U.S. Feb. 26, 1996) (No. 95– 1381); *Casa Marie, Inc. v. Superior Court,* 988 F.2d 252, 257 n. 6 (1st Cir.1993); *South–Suburban Housing Ctr. v. Greater South Suburban Bd. of Realtors,* 935 F.2d 868, 882 (7th Cir.1991) (en banc), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992); *United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975).

When the Fair Housing Act was amended in 1988, among other things, to prohibit discrimination on the basis of disability, Congress expressly indicated that discriminatory zoning decisions were prohibited by the statute. H.R.Rep. No. 711, 100th Cong., 2d Sess. 24 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2185. The 1988 amendments included language similar to that in the Title II regulation, prohibiting "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person [with a disability] equal opportunity to use and enjoy a dwelling...." 42 U.S.C. § 3604(f)(3)(B). Courts have confirmed that that language authorizes challenges to zoning actions. *See, e.g., City of Edmonds v. Washington State Building Code Council,* 18 F.3d 802 (9th Cir.1994), *aff'd,* —— U.S. ——, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995); *Casa Marie,* 988 F.2d at 270 n. 22; *Potomac Group Home Corp. v. Montgomery County, Md.,* 823 F.Supp. 1285 (D.Md.1993).

alleged that the Planning Board or the ZBA receive federal funding, their Rehabilitation Act claim must be dismissed.

Defendants rely upon two cases—*Brown v. Sibley*, 650 F.2d 760, 767 (5th Cir.1981) and *Cleburne Living Ctr., Inc.*, 726 F.2d 191, 195 (5th Cir.1984), *aff'd in part, vacated in part*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)—that pre-date the Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, 102 Stat. 28, 29 (1988). The Civil Rights Restoration Act amended the definition of "program or activity receiving Federal financial assistance" under the Rehabilitation Act to mean

> all of the operations of a department, agency, special purpose district or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government. . . .

29 U.S.C. § 794(b)(1)(A) (1995). The amendment was designed to "overturn" the Supreme Court's decisions in *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984) and *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984). *See Leake v. Long Island Jewish Medical Ctr.*, 869 F.2d 130, 131 (2d Cir.1989) (citing S.Rep. No. 64, 100th cong., 2nd Sess. 2, reprinted in 1988 U.S.Code Cong. & Admin.News 3, 3–4).

█ *Grove City* and *Darrone*, like the two cases relied upon by defendants, had interpreted the Rehabilitation Act to apply only to specific programs that received federal financial aid, and not to programs that received no federal financial aid, even if other programs within the same institution received federal financial aid. Now, under the Civil Rights Restoration Act, any program in an institution that receives federal financial aid, no matter how specific the purpose or program for which that aid is given, must follow the guidelines of the Rehabilitation Act of 1973. *See Leake*, 869 F.2d at 131.

Plaintiffs have sufficiently alleged that the City receives federal financial aid and that the City's programs, activities or instrumentalities, namely, the Planning Board and the ZBA, have discriminated against it to sustain a claim under the Rehabilitation Act claim. *Cf. Bentley v. Cleveland County Bd.*, 41 F.3d 600, 602–03 (10th Cir.1994); *Cohen v. Brown Univ.*, 991 F.2d 888, 894 (1st Cir.1993).

### c. Application of the ADA and the Rehabilitation Act to Zoning

█ Defendants also argue that this Court should not apply the ADA and the Rehabilitation Act to zoning, because to do so would counter our Court of Appeals' oft-stated principal that "[f]ederal courts should not become zoning boards of appeal." *Zahra v. Town of Southold*, 48 F.3d 674, 679 (2d Cir.1995). Defendants argue that, instead, plaintiffs could seek judicial review of the ZBA's decision in an Article 78 proceeding.

█ Defendants mistakenly frame the dispositive issue here as whether the IHS operation is a non-permitted use in the BR–4 zone, an issue that merely involves interpretation of the Zoning Ordinance. In fact, the complaint alleges discrimination on the basis of disability in violation of federally protected rights under the ADA and the Rehabilitation Act. It is by now well-settled that federal courts may exercise jurisdiction in zoning matters when local zoning decisions infringe national interests protected by statute or the constitution. *See Sullivan v. Town of Salem*, 805 F.2d 81, 82 (2d Cir.1986). Because federal law authorizes a claim, provides a remedy for discrimination against individuals with disabilities in zoning activities, and extends express power to the courts to modify discriminatory practices, defendants' argument that this is a zoning dispute more properly relegated to local regulatory and administrative procedures is simply not correct. *See, e.g., LeBlanc–Sternberg*, 67 F.3d at 434.

### 2. Whether plaintiffs have standing to sue under the ADA or the Rehabilitation Act

#### a. IHS

█ Because Article III of the Constitution limits the "judicial power" of the United States to the resolution of "cases" and "controversies," a litigant must, of course, have

"standing" to challenge the action at issue in the lawsuit. *See Valley Forge Christian College v. Ams. United for Separation of Church and State Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 754, 70 L.Ed.2d 700 (1982). "Standing," as the concept is now understood, subsumes a blend of constitutional requirements and prudential considerations. *See Valley Forge*, 454 U.S. at 471, 102 S.Ct. at 757 (citation omitted).

■ To satisfy the constitutional requirements for "standing" at this stage, the plaintiff must allege that (1) it personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant ("injury-in-fact"); (2) the injury fairly can be traced to the challenged action ("causation"); (3) the injury is likely to be redressed by a favorable decision ("redressability"). *See Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758.

■ Here, plaintiffs have alleged that IHS has been discriminated against on the basis of its association with individuals with disabilities, and that IHS has paid rent and other expenses relating to the vacant South Broadway site in the amount of $8,500 per month from July 1, 1994 to June 30, 1995, and $6,000 per month since July 1, 1995. For purposes of this motion, defendants concede that IHS has sufficiently alleged the constitutional requirements for "standing," namely, injury-in-fact, causation and redressability.

■ Apart from the minimum constitutional mandate, however, the Supreme Court has recognized certain prudential limits on the class of persons who may invoke the courts' decisional and remedial powers. *See Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). One such limit is that even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties. *See Warth*, 422 U.S. at 501, 95 S.Ct. at 2206 (citations omitted).

■ The source of a plaintiff's claim to relief is of critical importance with respect to this prudential rule of standing. Congress may, by legislation, expand standing to permit litigation by one "who otherwise would be barred by prudential standing rules." *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206. "Essentially, the standing question in such cases is whether the ... statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206. As long as the minimum constitutional requirements are met, "persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing to seek relief on the basis of the legal rights and interest of others ..." *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206.

■ Defendants argue that IHS' standing fails under this prudential rule because IHS rests its claim to relief on the legal rights of third parties, its clients. Defendants argue that the ADA and the Rehabilitation Act confer rights upon a narrow class of people, namely "individual[s] with a disability," 42 U.S.C. § 12132; 29 U.S.C. § 794. Citing *Kessler*, 876 F.Supp. 641, defendants argue that because IHS is not an "individual with disability," but rather an entity that serves the disabled, it does not have standing to bring an action under either the ADA or the Rehabilitation Act.

*Kessler* reasoned that both 42 U.S.C. § 12132, which confers a substantive right to be free from discrimination in the provision of public services, and 42 U.S.C. § 12133, the enforcement provision, which incorporates 29 U.S.C. § 794a of the Rehabilitation Act by reference, are limited to "qualified individual[s] with a disability." It held that because an entity that serves the disabled does not fall within the definition of a "qualified individual with a disability," the ADA conferred no substantive rights, and thus no standing, on the plaintiff entity. Plaintiff's ADA claim was therefore dismissed for lack of subject matter jurisdiction. *See Kessler*, 876 F.Supp. at 653.

■ *Kessler*, I respectfully conclude, misconstrued the appropriate analysis and the relevant provisions of the ADA. That a

plaintiff itself is not granted substantive rights "hardly determines whether [it] may sue to enforce the ... rights of others." *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 1609 n. 9, 60 L.Ed.2d 66 (1979). The central issue at this stage of the proceedings is not who possesses the legal rights under § 12132, but whether Congress intended standing under Title II to extend to entities such as IHS.

▮ Contrary to defendants' contentions, Title II of the ADA prohibits discrimination on the basis of disability in general terms, 42 U.S.C. § 12132, and extends relief to "any person alleging discrimination on the basis of disability." 42 U.S.C. § 12133. By its plain meaning, "[a]ny person alleging discrimination ..." need not be an individual with a disability, but may be anyone injured by a covered entity's discrimination against an individual on the basis of that individual's disability.

▮ In addition, Title II's enforcement provision was patterned after § 794a of the Rehabilitation Act. It extends all rights, remedies and procedures available under § 794a of the Rehabilitation Act to Title II:

> [t]he remedies, procedures, and rights set forth in section 794a of Title 29 shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title.

42 U.S.C. § 12133. Because, as discussed below, entities who are injured by discrimination on the basis of disability have standing under the Rehabilitation Act even though they are not disabled themselves, they would also appear to have standing under Title II.

▮ Title II's legislative history confirms that Congress intended to confer standing on a broader class of people than just "individuals with disabilities." Emphasizing its intent that Title II's prohibitions "be identical to those set out in the applicable provisions of titles I and III of this legislation ...," H.R.Rep. No. 485(II), 101st Cong., 2d Sess.

84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 303, 367, the House Committee on Education and Labor directed that "the construction of 'discrimination' set forth in section 302(b) [42 U.S.C. § 12182(b) of Title III, which explicitly prohibits discrimination on the basis of association] should be incorporated in the regulations implementing [Title II]." *Id.* at 367. The House Committee on the Judiciary report explained that "[t]itle II should be read to incorporate provisions of titles I and III ... such as Section 102(b)(4) [42 U.S.C. § 12112(b)(4), explicitly prohibiting discrimination on the basis of association]...." H.R.Rep. No. 485(III), 101st Cong., 2d Sess. 51 (1990), reprinted in 1990 U.S.C.C.A.N. 267, 303, 474. It is evident from the legislative history that Title II's protections should be read consistently with Title III's protections. *See Kinney v. Yerusalim,* 9 F.3d 1067, 1073 n. 6 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994).

Moreover, Congress required that the Department of Justice issue regulations implementing Title II, *see,* 42 U.S.C. § 12134(a) and directed that the regulations be "consistent with this chapter," 42 U.S.C. § 12134(b), meaning consistent with the entire Act, *see* "References in Text" to 42 U.S.C. § 12201, indicating that the more general nondiscrimination provisions of Title II should be read to include the more specific types of discrimination set forth in Titles I and III. As noted above, these "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute" *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. The Department of Justice's regulations implementing Title II specifically provide that "[a] public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 28 C.F.R. § 35.130(g).[6]

---

**6.** When it enacted the ADA, Congress also directed the Attorney General to provide technical guidance to those with "rights or duties" under the law. *See* 12206(a) & (c). The Department of Justice's own interpretation of its regulations in

the preamble and the TA Manual are entitled to "controlling weight unless ... plainly erroneous or inconsistent with the regulation[s]." *Thomas Jefferson Univ.,* 512 U.S. at ——, 114 S.Ct. at 2386. The preamble to the Title II regulations

Accordingly, as an entity that has sufficiently alleged injury-in-fact, causation, and redressability, and that is alleging discrimination on the basis of disabilities of its clients, IHS has standing to sue under the ADA. *See, e.g., Oak Ridge,* 896 F.Supp. at 871–72; *Tugg v. Towey,* 864 F.Supp. 1201, 1208 (S.D.Fla.1994); *Concerned Parents to Save Dreher Park Ctr. v. City of West Palm Beach,* 846 F.Supp. 986, 990 (S.D.Fla.1994); *Finley v. Giacobbe,* 827 F.Supp. 215 (S.D.N.Y.1993).

▉ IHS also has standing to sue under the Rehabilitation Act. The Rehabilitation Act extends its remedies to "any person aggrieved by" violations of Section 504. *See* 29 U.S.C. § 794a. "The use of the phrase 'any person aggrieved' in Section 505(a)(2) evinces a congressional intention to define standing to bring a private action under Section 504 as broadly as is permitted by Article III of the Constitution." *Nodleman v. Aero Mexico,* 528 F.Supp. 475, 485 (D.C.Cal.1981) (citing *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972)).

Indeed, courts have held that individuals and entities who are injured by discrimination on the basis of disability have standing under § 504 even though they are not, themselves, individuals with disabilities. *See, e.g., Sullivan,* 811 F.2d at 182 n. 12; *Greater Los Angeles Council on Deafness, Inc. v. Zolin,* 812 F.2d 1103 (9th Cir.1987); *Williams v. United States,* 704 F.2d 1162, 1163 (9th Cir. 1983); *United Handicapped Fed'n v. Andre,* 558 F.2d 413 (8th Cir.1977); *Independent Housing Servs. v. Fillmore Ctr. Assocs.,* 840 F.Supp. 1328 (N.D.Cal.1993).

### b. *Individual Plaintiffs*

▉ Defendants argue that the individual plaintiffs lack standing because they have not adequately alleged injury-in-fact.

▉ Plaintiffs allege, however, that defendants violated the individual plaintiffs' rights under the ADA and the Rehabilitation Act. Complaint ¶¶ 3, 86, 89, 91, 92, 100–105. "The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing. . . .' " *Warth,* 422 U.S. at 500, 95 S.Ct. at 2206 (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1149, n. 3, 35 L.Ed.2d 536 (1973). Thus, an allegation that defendants have violated the ADA and the Rehabilitation Act may suffice as an allegation of injury-in-fact.

▉ Plaintiffs also, however, allege that the individual plaintiffs have suffered discrimination. Complaint ¶¶ 3, 89, 103, 104. In evaluating plaintiffs' allegations, this Court must presume that "general allegations embrace those specific facts that are necessary to support the claim," and must

---

and the Title II TA Manual support the proposition that Congress intended to protect entities associated with individuals with disabilities. In discussing § 35.130(g) of the implementing regulations, the preamble provides:

> Paragraph (g), which prohibits discrimination on the basis of an individual's or entity's known relationship or association with an individual with a disability, is based on sections 102(b)(4) and 302(b)(1)(E) (42 U.S.C. § 12182(b)(1)(E)) of the ADA. . . .
> This protection is not limited to those who have a familial relationship with the individual who has a disability. Congress considered, and rejected, amendments that would have limited the scope of this provision to specific associations and relationships. . . .
> During the legislative process, the term "entity" was added to section 302(b)(1)(E) to clarify that the scope of the provision is intended to encompass not only persons who have a known association with a person with a disability, but also entities that provide services

to or are otherwise associated with such individuals. This provision was intended to ensure that entities such as health care providers, employees of social service agencies, and others who provide professional services to persons with disabilities are not subjected to discrimination because of their professional associations with persons with disabilities.

28 C.F.R. pt. 35, App. A at 453.

The TA Manual provides:

A State or local government may not discriminate against individuals or entities because of their known relationship or association with persons who have disabilities. This prohibition applies to cases where the public entity has knowledge of both the individual's disability and his or her relationship to another individual or entity. In addition to family relationships, the prohibition covers any type of association between the individual or entity that is discriminated against and the individual or individuals with disabilities, if the discrimination is actually based on disability.

TA Manual § II–3.9000 at 17 (November 1993).

sustain the complaint "if relief could be granted under any set of facts that could be proved consistent with the allegations." *Nat'l Org. for Women v. Scheidler,* 510 U.S. 249, 256, 114 S.Ct. 798, 803, 127 L.Ed.2d 99 (1994) (internal quotations and citations omitted.) A general allegation of discrimination embraces its inherent harms, such as stigma, insult, and the inability to receive the same opportunities as those who do not face discrimination. *Cf. Bronson v. Crestwood Lake Section 1 Holding Corp.,* 724 F.Supp. 148, 153 (S.D.N.Y.1989); *Gresham v. Windrush Partners,* 730 F.2d 1417, 1423 (11th Cir. 1984), *cert. denied,* 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 187 (1984).

Finally, plaintiffs have alleged a sufficient threatened harm in that they may need IHS' services again and that defendants' discrimination has and will continue to prevent the individual plaintiffs and others in White Plains from obtaining treatment at the South Broadway site. *See Mussington v. St. Luke's–Roosevelt Hospital Ctr.,* 824 F.Supp. 427, 430–31 (S.D.N.Y.1993), *aff'd,* 18 F.3d 1033 (2d Cir.1994).

Accordingly, this Court finds that plaintiffs have sufficiently alleged that the individual plaintiffs have been injured in fact for purposes of "standing" under the ADA and the Rehabilitation Act.

3. *Whether plaintiffs have alleged facts stating a claim against the Planning Board, Mary Cavallero, the City and Mayor Schulman*

■■■ Defendants argue that the complaint should be dismissed as against the Planning Board, Mary Cavallero, the City and Mayor Schulman because it fails to state a claim against them.

■ To state a claim under the ADA, plaintiffs must allege that (1) they are "qualified individuals with a disability"; (2) they are being excluded from participation in or denied the benefits of some service, program, or activity by reason of their disability; and (3) the entity which provides the service, program or activity is a public entity. *See Clarkson v. Coughlin,* 898 F.Supp. 1019, 1037 (S.D.N.Y.1995).

■ To state a claim under the Rehabilitation Act, plaintiffs must allege that (1) they are "individuals with a disability" under the Act; (2) they are "otherwise qualified" to participate in the activity or program or to enjoy the services or benefits offered; (3) they are being excluded from participation, denied the benefits of, or subjected to discrimination under, any program or activity solely by reason of their disability; and (4) the entity denying plaintiffs' participation or enjoyment receives federal financial assistance. *See Rothschild v. Grottenthaler,* 907 F.2d 286, 289–90 (2d Cir.1990).

Here, with respect to the Planning Board and Cavallero, the complaint alleges that plaintiffs are "individuals with a disability," who are otherwise qualified to enjoy the benefits of the activities of the Planning Board, i.e., its investigations, reports and recommendations relating to the planning and development of the City, *see* N.Y.Gen.City § 27. Plaintiffs further allege that they have been denied the benefits of the activities of the Planning Board by reason of their disability. Specifically, they allege that because of the opposition to IHS' change of use application, which was based on bias and hostility towards individuals with alcohol or drug dependency, ¶¶ 36 and 37, (1) the Planning Board requested the Commissioner of Building to reconsider his previous determination that IHS' treatment program was a permitted "office" use, ¶ 39; (2) IHS had to withdraw its change of use application because of the delay and mounting costs resulting from the Planning Board's review of its application, § 41; and (3) Cavallero wrote a memorandum to the Commissioner of Building on October 26, 1994 expressing the Planning Board's opposition to having IHS' treatment program in the building, ¶ 42.

Finally, plaintiffs allege that the City is a recipient of federal financial assistance whose Zoning Board, Planning Board and zoning activities are "programs or activities" subject to the non-discrimination requirements of the [Rehabilitation Act]," ¶¶ 83, 100, and that the Planning Board is a public entity under the ADA, ¶¶ 17, 79. Accordingly, this Court finds that plaintiffs have alleged each element of a claim under the ADA and Rehabili-

tation Act against the Planning Board and Cavallero.

■ The complaint does not contain any allegations against the City specifically. Plaintiffs argue, however, that because the City legislature creates and funds the Planning Board, *see* N.Y.Gen.City § 27, and establishes and funds the ZBA, *see* N.Y.Gen. City § 81, it is a proper defendant. Accordingly, because the City is vested with authority to establish zoning regulations, *see* N.Y.Gen.City §§ 19, 20(24) & (25), and regulates the use of property through its agencies, the Planning Board and the ZBA, *see* N.Y.Gen.City §§ 27, 81, it is a proper defendant.

■ The complaint also does not contain any allegations against the Mayor, S.J. Schulman. Although the Mayor has authority to appoint members of the Planning Board and ZBA, *see* N.Y.Gen.City §§ 27, 81, plaintiffs have not alleged any facts stating a claim based on this authority. Accordingly, plaintiffs have failed to state a claim against the Mayor and his motion to dismiss is granted.

4. *Whether permitting IHS' use of the building for its treatment program is a "reasonable modification" of the Zoning Ordinance under the ADA and Rehabilitation Act*

■ Under the ADA and Rehabilitation Act, public entities and entities receiving federal financial assistance are required to make "reasonable modifications" or "reasonable accommodations" in their rules, policies and practices when necessary to avoid discrimination. *See* 42 U.S.C. § 12131(2); 45 C.F.R. § 84.3(k); *Southeastern Community College v. Davis*, 442 U.S. 397, 413, 99 S.Ct. 2361, 2370–71, 60 L.Ed.2d 980 (1979). An accommodation is reasonable if it does not cause any undue hardship or fiscal or administrative burdens on the municipality, or does not undermine the basic purpose that the zoning ordinance seeks to achieve. *See Sch. Bd. v. Arline*, 480 U.S. 273, 287 n. 17 (1987); *Oxford House, Inc. v. Town of Babylon*, 819 F.Supp. 1179, 1186 (E.D.N.Y.1993).

Plaintiffs allege that even if their treatment program does not fall within the permitted "office" use of the Zoning Ordinance, defendants have discriminated against them by failing to make a reasonable modification in the application of the Zoning Ordinance. Defendants argue that if IHS' treatment program is not a permitted "office" use, any accommodation or modification permitting IHS' use would fundamentally alter its Zoning Ordinance, and thus, would not be reasonable.

■ In considering whether a proposed accommodation or modification is mandated by the ADA or the Rehabilitation Act, the Court must balance the plaintiffs' interest in operating from the South Broadway site against the defendants' interest in the integrity of its zoning scheme. Whether an accommodation or modification allowing IHS' use is "reasonable" is clearly a question of fact that cannot be resolved on this motion to dismiss for failure to state a claim. *Cf. Oxford House, Inc. v. City of Virginia Beach*, 825 F.Supp. 1251, 1261 (E.D.Va.1993) ("inherent in the concept of 'reasonable accommodation,' as established by the Fair Housing Act, is that the interest of, and benefit to, handicapped individuals ... must be balanced against the interest of, and burden to, municipalities in making the requested accommodation under the facts of each case); *accord Robinson*, 890 F.Supp. at 621.

**B.** *Motion for a Preliminary Injunction*

1. *Legal Standard*

■ To grant a preliminary injunction, the moving party must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. *See Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991).

■ Defendants argue that because an injunction here would alter, rather than maintain, the status quo, and will provide plaintiffs with substantially all the relief sought and that relief cannot be undone even

if defendants prevail at a trial on the merits, plaintiffs must meet the higher standard of likelihood of success required for a mandatory injunction, *see Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir.1995). A mandatory injunction or an injunction providing all the relief sought should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985).

Here, however, the preliminary injunction is prohibitory, rather than mandatory. Plaintiffs request relief prohibiting defendants from interfering with the issuance of a building permit and IHS' renovation and occupation of the South Broadway site. Such relief would not require defendants to perform an act, but merely to refrain from performing one. *See Abdul Wali*, 754 F.2d at 1025–26.

In addition, the effect of a preliminary injunction, once complied with, could be undone, if defendants succeed at a trial on the merits. The preliminary injunction prohibits defendants from interfering with the issuance of a building permit during the pendency of the action until a final decision is reached on the merits. It is not the equivalent of granting ultimate relief. Plaintiffs concede that if they do not prevail on the merits, the building permit may be revoked and IHS may have to relocate from the South Broadway site. Accordingly, the higher standard of proof required for mandatory injunctions or injunctions substantially providing all the relief sought and the effects of which cannot be undone does not apply here.

### 2. *Irreparable Harm to the Plaintiffs*

 In support of their claim of irreparable harm, plaintiffs offer affidavit testimony of Dr. Ross Fishman, the director of IHS, and Maria B., a client of IHS. Dr. Fishman attests to the "myriad of ways" in which IHS could better serve its current clients and new clients at the South Broadway site. He states that the convenience and the larger space of the South Broadway site would enable IHS to expand its services to provide more group therapy, add a program to serve the children of alcoholics and substance abusers, hold educational seminars for businesses in the community, provide vocational training and offer babysitting services for clients attending counseling sessions.

Dr. Fishman further attests that the space and inconvenience of the current site has caused clients to drop out or miss critical therapy sessions. The lack of public transportation has caused IHS to dismiss at least one client from treatment. The lack of child care has caused two clients to drop out of treatment in the past year. Dr. Fishman states that there is a critical shortage of treatment facilities in the country and in New York State. According to Dr. Fishman, the recent closure of the New Beginnings program at the county jail has intensified the need for IHS' services. Dr. Fishman also states that he is unaware of any program in White Plains that serves children of alcoholics and substance abusers, who are themselves particularly vulnerable to addiction. Dr. Fishman further attests that the insult of the community's and City's discrimination may damage clients' self-esteem jeopardizing their recovery. Finally, he states that, without treatment, many of IHS' clients and potential clients are likely to continue to abuse alcohol and drugs, resulting in death, illness or disability.

Maria B. attests to the fact that, unless she receives a ride from a friend, she is unable to arrive at IHS in time to participate in her drug treatment group because of IHS' current location and the poor public transportation. She states that she would be able to walk to the South Broadway site. She also states that she had hoped to attend vocational training classes as part of her recovery but will not be able to unless IHS moves to the South Broadway site. As a result, she may have to disrupt her treatment program to attend classes elsewhere.

Courts have held that the deprivation of treatment needed to recover from addiction or prevent relapse constitutes irreparable injury. For example, in *Sullivan*, the court affirmed a preliminary injunction requiring the city to grant building and other permits for the operation of a group home for recov-

ering alcoholics. The court found that the plaintiffs were primarily recovering alcoholics in a critical state of their recovery:

> [w]ithout proper care, supervision and peer support each could easily relapse. For these alcoholics, a relapse threatens not only a potentially irremediable reversion to chronic alcohol abuse but immediate physical harm or death.

*Sullivan*, 811 F.2d at 179. *See also Easter Seal Soc'y v. Township of N. Bergen*, 798 F.Supp. 228, 237 (D.N.J.1992) ("for each day that this project is delayed, eight protected individuals are forced to move into other environments which endanger their recent recovery" constituting threatened irreparable harm); *Oxford House–Evergreen v. City of Plainfield*, 769 F.Supp. 1329, 1345 (D.N.J. 1991) (holding that closure of group home for substance abusers would cause irreparable harm due to loss of home and supportive and stable environment).

Because the evidence indicates that the inconvenience and lack of space at IHS' current location has interfered, disrupted and prevented treatment of current clients and potential clients, this Court finds that plaintiffs have demonstrated a likelihood of irreparable harm should the Court deny the requested relief.

Plaintiffs also argue that this Court should presume irreparable harm upon a finding of intentional discrimination in violation of the ADA or the Rehabilitation Act. Courts have presumed such harm in the context of Fair Housing Act. *See Gresham*, 730 F.2d at 1423–24; *Stewart B. McKinney*, 790 F.Supp. at 1208; *Bronson*, 724 F.Supp. at 153. Because plaintiffs have otherwise demonstrated irreparable harm, this Court need not address plaintiffs' alternative basis for a finding of threatened irreparable harm.

### 3. *Likelihood of Success on the Merits*

 In addition to the arguments advanced in their motion to dismiss, which this Court has already rejected, defendants' argue that there is no evidence that defendants discriminated against plaintiffs on the basis of their disability. Under a discriminatory treatment analysis, plaintiffs must demonstrate differential treatment of similarly situated persons or groups. *See Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 933 (2d Cir.), *review declined in part, judgment aff'd*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). The court must conduct "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" to determine whether plaintiffs' disability was at least a partial motivating factor in defendants' decision. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

 To prevail on their claim of discriminatory treatment, the plaintiffs are not required to show the defendants were motivated by some purposeful, malicious desire to discriminate against drug and alcohol-dependent people. Nor must they prove the defendants were motivated solely, primarily, or even predominantly by the disability of IHS' clients. They need only show that the drug and alcohol-dependent status of IHS' clients was a motivating factor in prohibiting IHS from operating its treatment program at the South Broadway site. *See Pack v. Clayton County*, No. 1:93–CV–836–RHH, slip op. at 24 (N.D.Ga., Aug. 27, 1993), *aff'd*, 47 F.3d 430 (Table) (11th Cir., Jan. 25, 1995); *Stewart B. McKinney Found., Inc. v. Town Plan and Zoning Comm'n*, 790 F.Supp. 1197, 1211 (D.Conn.1992) (citing *Village of Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 563–64).

Defendants argue that there is no evidence that the opposition expressed by some community members at the public hearing influenced the Planning Board's actions or the ZBA's decision. To the contrary, defendants have submitted affidavits from four of the five members of the ZBA, in which they attest that the ZBA decided the appeal strictly on the basis of whether the IHS proposed use at 33 South Broadway was an office, and, therefore, whether the proposed IHS operation was permitted in the BR–4 zoning district. Defendants argue that although members of the public expressed grave concerns about IHS' proposed operations, the transcripts of the proceedings reveal that discussions among the

board members related solely to zoning and usage matters.

The South Broadway building is in a mixed business-residential (BR–4) Zoning District that allows a combination of retail, office, governmental, service business and residential uses, but prohibits "hospitals and sanitaria" uses. "Hospitals and sanitaria are defined as institutions for the purpose of serving general medical, surgical, psychiatric, physical therapy and rehabilitation purposes. Such 'use' may include out-patient clinics or nursing, teaching medical research, convalescent or extended care facilities sponsored by or affiliated with such a hospital or sanitarium." Zoning Ordinance, § 6.7.5.1.

■ The transcript of the July 5, 1995 ZBA decision interpreting the Zoning Ordinance and reversing the decision of the Commissioner of Building indicates that members focused on IHS' description of itself as an "outpatient alcoholic clinic" in its certificate of incorporation, and on the group nature of IHS' activities. The ZBA classified IHS as a "clinic" without reference to that term's use in the Zoning Ordinance. Although IHS calls itself a "clinic," it does not serve "general medical, surgical, psychiatric, physical therapy and rehabilitation purposes," and, in any event, IHS clearly is not sponsored by or affiliated with a hospital or sanitarium. The ZBA also did not explain how IHS' group services distinguish it from other counseling and treatment programs that exist undisturbed in the same zoning district.[7]

■ Defendants argue, however, that this Court should not sit as a super zoning board of appeals and second guess the ZBA's interpretation of the Zoning Ordinance. Indeed, defendants quite correctly contend that to adduce evidence of discriminatory intent, plaintiffs must show more than that the ZBA's decision was wrong; they must prove

7. Plaintiffs have submitted the affidavits of Sally Friedman, counsel for the plaintiffs, and Dr. Fishman attesting that psychiatrists and social workers currently operate out of offices in the same zoning district, some even out of Cameo House itself. The affidavits state that these psychiatrists and social workers offer counseling services virtually identical to those proposed by IHS and have patients with drug and alcohol problems. The Fishman affidavit also states that IHS is currently operating in a zoning district which also prohibits "hospitals or sanitaria" use. Finally, the Fishman affidavit states that the Health Insurance Plan of Greater New York ("HIP") has recently located a new medical facility in the same BR–4 district as the 33 South Broadway site, and has received a temporary certificate of occupancy from the Department of Buildings to operate as "professional offices" even though literature submitted by HIP and its architects to the Department of Buildings, and attached to the affidavits, plainly describes the operations as a "group medical practice" where employees will perform "diagnostic, exam, and superficial treatment."

Defendants argue that because plaintiffs do not identify the psychiatrists and social workers operating in the same zoning district, they cannot respond to plaintiffs' assertion that the services offered are virtually identical to IHS' proposed use. They argue that there may be a variety of different reasons why a medical or health related operation may be a permitted use in the BR–4 zoning district. For example, it may be an office in the residence of a "professional person" as regulated by § 5.4.2 of the Zoning Ordinance, or it may be allowed as a use variance under § 10.3.5.1 of the Zoning Ordinance.

Plaintiffs, however, have identified at least some of the psychiatrists and social workers—those operating out of offices in Cameo House—whom they state are offering virtually identical services in the same zoning district.

In addition, defendants have offered no rejoinder to plaintiffs' assertion that HIP is permitted to operate as an "office," despite its being a "group medical practice," except that its proposed use has never been appealed to the ZBA. The ZBA, however, was aware of HIP's proposed use—plaintiffs have attached a letter from an attorney for Cameo House Owners to the ZBA, dated April 4, 1995, informing the ZBA of HIP's offices, and stating that while he considered IHS an "unfavorable use" his client had no objection to HIP's clinic—but neither acknowledged nor explained the apparent differential treatment.

The Court also notes that 7 Holland Avenue, where IHS is currently located, is in a Light Industrial zoning district, which also permits "office" use, but not "hospitals or sanitaria." The Building Commissioner opined that IHS' operations at 7 Holland Avenue fell into the "office" use category, and no one has challenged that interpretation. Although perhaps not conclusive of differential treatment, evidence that IHS has operated until now as an "office" in a district prohibiting "hospitals and sanitaria," or evidence that other entities are permitted to provide services similar to those proposed by IHS, in the same zoning district, even if none of these uses has been appealed to the ZBA, is relevant at the very least to defendants' alleged interest in maintaining the integrity of their Zoning Ordinance.

the decision resulted from the ZBA's intent to discriminate. *See Lieberman v. Gant,* 630 F.2d 60, 65 (2d Cir.1980). Thus, plaintiffs must show more than that public opposition to IHS' proposed operations was discriminatory because "in the ordinary course of affairs a decisionmaker is not to be saddled with every prejudice and misapprehension of the people he or she serves and represents." *Assoc. of Relatives and Friends of AIDS Patients v. Regulations and Permits Admin.,* 740 F.Supp. 95, 104 (D.Puerto Rico 1990).

On the other hand, however, courts have cautioned that,

> a decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process. A ... discriminatory act would be no less illegal simply because it enjoys broad public support. Likewise, if an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter.

*Assoc. of Relatives,* 740 F.Supp. at 104; *accord Stewart B. McKinney,* 790 F.Supp. at 1212.

This Court concludes that the evidence supports plaintiffs' claim that defendants bowed to the political pressure exerted by certain members of the community. The Court's conclusion is based on its findings that defendants' interpretation of the Zoning Ordinance was highly questionable, that defendants were operating in the context of intense political pressure from important components of the community against IHS' relocation to the South Broadway site, and that defendants inexplicably failed to defer to the Commissioner of Building, an agency entitled to their deference, which had determined and then confirmed with public counsel that IHS' use was permitted. This constellation of factors leads to the conclusion that the defendants permitted illegal prejudices to influence their decision-making process, which is all that plaintiffs are required to show.

The Friedman and Fishman affidavits attest to the vociferous opposition to IHS' proposed use of the South Broadway site expressed during the pendency of IHS' application to the Commissioner, the Planning Board and in the public hearing before the ZBA.[8] This opposition from residents, community members and major commercial property owners was in large measure clearly based on hostility and animus towards drug and alcohol-dependent people. This Court cannot overlook the fact that defendants were not operating in a vacuum. While the individual members of the Planning Board and ZBA may not have had strong views on IHS' relocation to the South Broadway site, their community constituency expressed fervent and illegal resistance.

That the defendants' analysis was tainted by the discriminatory views of certain members of the community is further exhibited by their failure to account for the lack of deference given to the interpretation of the Build-

---

**8.** Plaintiffs have also submitted letters from the Fashion Mall Partners and Cameo House attorneys, dated September 21, 1994, opposing IHS' application for a building permit, in which the attorneys argued that IHS' proposed use should be construed as a prohibited "hospital or sanitarium" and that a "chemical abuse rehabilitation clinic poses a real quality of life problem for the residents of Cameo House"; a letter, dated October 26, 1994, from the chair of the Planning Board to Commissioner Amicone expressing the Board's opposition to IHS' application; letters, dated during the pendency of IHS' application, from residents of Cameo House and their attorneys to Mayor Schulman, urging him to bar IHS from the South Broadway site and thereby maintain their quality of life, security, tranquility and value of their property; a letter from the attorney for Cameo house Owners to the chair of the ZBA, dated April 4, 1995, in which he stated that "IHS' operations and its clients ... would be an unwelcome addition to the Cameo House neighborhood," voiced concern that drug and alcohol-dependent people would be entering the building at night and that business at "The Westchester" would be adversely affected; a letter from a Cameo House resident to the chair of the ZBA, dated April 11, 1995, stating that even if IHS' clients were middle class, they would "exhibit the erratic, antisocial and sometimes illegal behavior we associate with the impecunious backslider"; and portions of the transcript of the public hearings in which a ZBA member mentioned that he saw two books about HIV in one of the therapy rooms in IHS' current site.

ing Commissioner. The Commissioner determined—and later, after reconsideration, reaffirmed his determination—that IHS' proposed use was an office use under the Zoning Ordinance.[9] The Corporation Counsel was consulted, reviewed the matter and concurred with the Commissioner's conclusion.

In response to a request from the Commissioner for a legal review of IHS' proposed operations, the Corporation Counsel issued a memorandum, dated December 19, 1994, in which it stated, after reviewing the arguments of those appealing the Commissioner's decision, that the Commissioner's decision was correct and IHS' proposed use should be permitted at the South Broadway site. The Corporation Counsel further opined that "[i]t is well-settled law that [as the enforcing authority of the Zoning Ordinance, the Commissioner's] decisions [interpreting and enforcing provisions of the Zoning Ordinance] are entitled to great weight, and should only be overturned if clearly in error and without any basis in the record."

Despite the well-settled law referred to by the Corporation Counsel, the ZBA offered no compelling authority to counter the Commissioner's interpretation of the Zoning Ordinance and determination that IHS' proposed use was an "office" use. In fact, the basis for the ZBA's decision to overturn the Commissioner's decision was at best unclear.

The presence of other entities offering services similar to IHS' proposed use in the same zoning district, the defendants' flawed interpretation of the Zoning Ordinance, the accord between the Corporation Counsel and the Commissioner as to the correct interpretation of the Zoning Ordinance, the considerable animus towards drug and alcohol-dependent people expressed by certain members of the community and their attorneys during the pendency of these proceedings, and the nebulous reasoning of the ZBA in overturning an interpretation of the Commissioner, which was entitled to deference, lead to the conclusion that defendants "seized upon the most plausible, but improbable, section[ ]" of the Zoning Ordinance to prohibit IHS from operating at the South Broadway site and thereby appease public opposition. *McKinney*, 790 F.Supp. at 1213.

### 4. Sufficiently Serious Questions Going to the Merits and the Balance of Hardships

■ Defendants argue that the balance of hardships tips in their favor. They assert that the public has an interest in maintaining the purposes of the White Plains Zoning Ordinance, but that the plaintiffs seek to place themselves above the law by circumventing the Zoning Ordinance and the General City Law. They argue that others who contest a ZBA decision either commence an Article 78 proceeding or seek a variance, both of which plaintiffs refuse to do. According to defendants, to grant an injunction would be to create a potentially uncontrollable exception to the Zoning Ordinance. Encouraged by this Court, this reasoning goes, everyone would seek to circumvent the Zoning Ordinance and the General City Law by filing in federal court without first commencing an Article 78 proceeding or seeking a variance.

Defendants argument fails for reasons stated above in connection with their motion to dismiss. Plaintiffs are not required to

---

9. Plaintiffs have attached a letter from Deputy Commissioner Edward Brunner, dated December 22, 1992, stating that IHS' proposed use of the South Broadway site for "counseling offices only, with no physicians on staff for physical examination or dispensing of medication ... would qualify the use as a business/professional office"; a memorandum, dated July 21, 1994, from Commissioner Amicone reaffirming his previous determination "that [IHS'] proposed use would be an office use under zoning"; a letter, dated December 14, 1994, in which Commissioner Amicone issued a determination that IHS' proposed use "is considered an office use" under the White Plains Zoning Ordinance, based on the conditions that the proposed use continue to function as an office use as it currently does at its present location, dispensing of medication or drugs will not take place on the premises, clients or staff are not permitted to stay overnight or long term, and no physical examinations are to be performed; and a letter from Commissioner Amicone to the chair of the ZBA, dated April 4, 1995, stating that the layout and operation of IHS' current facility was "consistent with an office use" and "[t]here were no facilities for performing physical examinations or dispensing medication, or for overnight accommodation of either staff or clients."

commence an Article 78 proceeding or apply for a variance before suing under the ADA or the Rehabilitation Act. In enforcing federal statutes, this Court will not be acting merely as a zoning board of appeal. Plaintiffs' allegations of discrimination on the basis of disability convert this case from a garden-variety zoning dispute to a case in which a local zoning decision allegedly has infringed national interests protected by federal statutes. The ADA and Rehabilitation Acts provide federal courts with express power to address and to modify discriminatory practices.

As discussed in section 3 above on the likelihood of success on the merits, plaintiffs have demonstrated sufficiently serious questions going to the merits to make them a fair ground for litigation.

Plaintiffs also argue that defendants will suffer no damage from a preliminary injunction permitting IHS to relocate downtown. To the contrary, courts have held that the public interest is furthered by the issuance of an injunction to enjoin interference with the treatment of alcoholics and substance abusers. *See Sullivan,* 811 F.2d at 185; *Easter Seal,* 798 F.Supp. at 238; *Oxford House–Evergreen,* 769 F.Supp. at 1345–46. The foregoing constitutes the Court's findings of fact and conclusions of law. *See* Fed. R.Civ.P. 65(d).

In conclusion, plaintiffs' motion for a preliminary injunction is granted. Defendants' motion to dismiss is denied, except as to the defendant Mayor of White Plains, S.J. Schulman.

SO ORDERED.