FIRST STEP, INC., Kathleen Smith, Dianne Benson, Marceil Richter, William Savage, Plaintiffs,

v.

CITY OF NEW LONDON, New London Planning & Zoning Commission, Joseph Heap, Peter Gillespie, Susan Brandt, Defendants.

No. 3:02 CV 1748(SRU).

United States District Court, D. Connecticut.

Jan. 23, 2003.

Philip D. Tegeler, Erin Boggs, Conn. Civ. Liberties Union Foundation, Hart-ford, CT, Susan V. Wallace, Middletown, CT, for First Step, Inc., Kathleen Smith, Dianne Benson, plaintiffs.

Thomas A. Behrendt, Conn. Legal Rights Project, Inc., Middletown, CT, Susan V. Wallace, Middletown, CT, for Marcel Richter, William Savage, plaintiffs.

Brian K. Estep, Conway & Londregan, New London, CT, Thomas R. Gerarde, John J. Radshaw, III, Melinda A. Powell, Howd & Ludorf, Hartford, CT, for City of New London, defendant.

Thomas R. Gerarde, John J. Radshaw, III, Melinda A. Powell, Howd & Ludorf, Hartford, CT, for New London Planning and Zoning Com'n, Joseph Heap, Peter Gillespie, Susan Brant, defendants.

### MEMORANDUM OF DECISION AND ORDER

UNDERHILL, District Judge.

The present suit arises from the decision of the Planning & Zoning Commission of the City of New London, Connecticut ("Zoning Commission") to deny First Step, Inc.'s ("First Step") application for a special use permit to relocate its headquarters within the City of New London. First Step claims that this denial and the underlying zoning regulations of the City of New London violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq.; the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794 et seq.; the Equal Protection Clause of United States Constitution; and Article 1, Sections 1 and 20 of the Connecticut Constitution.

This decision follows a two-day bench trial that was limited to issues of liability and injunctive relief.[1] The parties agreed

---

1. It was agreed at the pretrial conference on December 19, 2002 that this hearing would

that, in the event the court ruled in favor of the plaintiffs on liability, consideration of the issue of damages would be heard after the court's ruling. The following constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FACTS

First Step is a non-profit corporation with the stated mission of "educating and assisting individuals with disabilities to achieve independence and integrate into the larger community." (Ex. 1 at 2.) Plaintiffs Kathleen Smith, Dianne Benson, Marceil Richter, and William Savage are clients of First Step.

Defendant Zoning Commission regulates the location, structural requirements, and uses of buildings in the City of New London. Defendant Joseph Heap is Chairman of the Zoning Commission, Defendant Peter Gillespie is the New London City Planner, and Defendant Susan Brant is the New London Zoning Enforcement Officer. The parties have stipulated that Defendant City of New London is a recipient of federal funds.

### First Step

First Step's programs are designed for, and restricted to, low income persons with severe and persistent mental illness. First Step refers to persons using its services as "clients." Common illnesses among First Step clients are schizophrenia, bipolar disorder, and major depression. Many clients, including Benson, also suffer from physical disabilities. The parties have stipulated that, "[f]or purposes of the ADA and Rehabilitation Act, each of the individual plaintiffs in this lawsuit is a person with a mental or psychiatric disability that substantially limits major life activities and is severe and persistent."

First Step's programs are part of a coordinated network of mental health services under the umbrella of the Southeastern Mental Health Authority, a division of the Connecticut Department of Mental Health and Addiction Services. First Step programs include case management, vocational education, residential education, and the Oasis Center, a social rehabilitation and life skills training center. The case management and vocational education programs, as well as the Oasis Center, are run out of First Step's headquarters at 38 Green Street in New London, Connecticut ("Green Street site").

The goal of all of First Step's programs is to assist persons with psychiatric disabilities to live successfully within the community. The plaintiffs submitted a substantial amount of testimony and other evidence that, without First Step's services, First Step clients would have great difficulty functioning effectively in the community. (Smith test., Jan. 3, 2003 at 14) ("If I stay home, I'm very suicidal. I have a hard time. I need people. I need a place where people understand me and it gets me out so I'm not thinking of things to hurt myself with. They are there for me and if it wasn't for First Step I probably would be dead.")

To transport its clients to and from its facilities, First Step uses two fifteen-passenger vans.[2] First Step only provides

not address the plaintiffs' disparate impact claim in paragraph 57e of the amended complaint.

**2.** First Step also uses its vans to transport staff to and from off-site meetings. Under its site use proposal for the Truman Street site, because parking at the property is limited and

staff would have to park at a public parking lot four-tenths of a mile away, First Step would also use its vans to shuttle staff members to and from their cars before and after work.

such transportation to clients who reside within the City of New London. The forty percent of First Step clients who reside outside of New London must find their own transportation. Few First Step clients own vehicles. In light of their severe psychological and physical disabilities and their lack of vehicles, the court finds that many First Step clients would not be able to participate in First Step programs if transportation to and from the First Step center were not provided.

### The 38 Green Street site

First Step applied for the special use permit for the Green Street site in 1991 as an institution of higher learning, pursuant to Section 530.2(17) of the Zoning Regulations. Section 530.2(17) permits use in the Central Business District for:

> Institutions for higher learning, business, vocational, and training schools, including colleges, universities, junior colleges, business, banking, business management, secretarial and office schools, art and drafting schools, school for training in the martial arts, dancing, gymnastics, and music, schools for fashion design . . . .

Despite a requirement in subsection 17 that the curriculum of such institutions for higher learning satisfy the requirements of the Connecticut State Department of Education, First Step is not accredited as a school, nor are its staff members certified as teachers.

Witnesses testified that First Step's current facility is inadequate for many reasons. Simsarian, Benson, and Smith testified that the building is not handicapped accessible, staff members have to share offices and telephones, and that the building lacks conference rooms, a staff lounge area, and sufficient space for programming, among other problems. These inadequacies inhibit client-staff confidentiality and communication, interfere with First Step's ability to supervise its staff, and ultimately detract from the breadth and quality of its programs. Benson and Smith testified that some clients or potential clients do not attend First Step programs, or have significant difficulties attending, because the facilities are to small to accommodate all clients, are not handicapped accessible or are otherwise inadequate. Benson also testified that some programs she would like to participate in, and that First Step could offer in the Truman Street building, are not currently offered because of insufficient space in the Green Street site. Despite these shortcomings in its facility, First Step's evaluations from clients are overwhelmingly favorable.

### Prior attempts to relocate

In 1999, First Step considered moving to 19 Jay Street in New London, as well as other locations within New London. First Step withdrew its application for zoning approval and abandoned its plan to move to 19 Jay Street after encountering opposition from the community and at the suggestion of area legislators.

Following its failed attempt to move to Jay Street, First Step considered approximately ten additional properties. Those properties were either inadequate for First Step's needs or unavailable.

### The Truman Street Site

Since at least November 2001, First Step has been attempting to relocate to 82 Truman Street ("Truman Street site") "in order to provide an improved environment for its clients and to provide additional space to operate more efficiently and effectively." (Compl. at ¶ 26.) The Truman Street site had previously served as a local office of the Connecticut Department of Motor Vehicles. In 2002, First Step obtained an option to purchase the site.

The front of the Truman Street site is situated on Truman Street, facing southeast. On the western side of the building, a driveway runs northwest to the rear of the property. The driveway is approximately 120 feet long. Although that driveway is 11 feet, 5 inches wide at its opening on Truman Street, it narrows to 9 feet, 5 inches wide toward the rear of the building. Behind the building lies a parking lot that would accommodate 33 cars, according to the plaintiffs' traffic expert, William Vliet of Vliet & O'Neill, LLC. From the parking lot, another driveway running northwest leads out onto Hope Street, which is roughly parallel to Truman Street. The southwest and northeast sides of the property are entirely enclosed by adjoining properties.

The distance between the Truman Street site driveway on Hope Street and the intersection of Hope Street and Hempstead Street is approximately 150 feet. There are four driveways, six residences, and parking on both sides of that stretch of Hope Street.

Although both the Green Street and Truman Street buildings offer approximately 10,000 square feet of space, Keyes testified that the space is spread over four floors at the Green Street building versus just two floors at the Truman Street building. As a result, the layout of the Truman Street site permits more efficient use of space.

First Step proposes to move the main entrance of the building from the front of the building on Truman Street to the rear of the building, facing the parking lot. First Step claims that this change is necessary to make effective use of the interior space. First Step also proposes to locate a patio and paved garden area at the rear exit. The patio would provide a place for staff and clients to socialize or smoke. This addition is at least in part proposed in response to the city's many complaints about First Step clients loitering outside the front entrance of the current Green Street site.

*Traffic impact*

Vliet prepared a Traffic Impact Statement for First Step dated May 14, 2002. The parties have stipulated to the accuracy of the traffic generation data presented in that report, as well as to the accuracy of the data presented in Vliet's June 12, 2002 letter to City of New London Traffic Safety Officer Edmund M. Hedge, Jr. In his report, Vliet stated that "[t]he development use will generate a maximum of 75 round trips on a daily basis, Monday through Friday and substantially less (6–7 maximum round trips) on Saturday." (Ex. 14 at 1.) Compared to the traffic generated by prior uses of the building, this traffic impact is quite small. Vliet stated that "[t]he previous [uses] on the site (DMV Office/Licensing/Inspection & Social Services Offices) most probably generated significantly more traffic than the proposed use." *Id.* at 1–2. Vliet concluded in his statement that "[n]o measurable impact will result from the addition of the site generated traffic to the adjacent roadway system. Roadway conditions will continue to provide safe and efficient travel operation." *Id.* at 2.

Vliet also testified at trial that 75 round trips per weekday was relatively light traffic compared to the amount that would be generated by nearly any other use of the building. Vliet testified that a single office tenant such as a law or engineering firm would generate approximately 115 round trips; a medical or dental office would generate approximately 180 round trips; a library would generate approximately 270 round trips; a pharmacy would generate approximately 450 round trips; and a DMV office would generate 800 round trips. The only example Vliet gave of an

alternative use that would generate less traffic was a day care center, which would generate approximately 60 round trips.

On May 24, 2002, Vliet met with Hedge regarding the city's concerns about traffic flow at the Truman Street site. Hedge was primarily concerned with traffic both entering and leaving the parking lot from Hope Street. At Gillespie's request, First Step modified its site plan to address the city's expressed concerns, by agreeing to a one-way traffic pattern entering the property from the Truman Street driveway and a one-way exit from the property on Hope Street, and by agreeing to a drop-off zone for vans in front of the building, to reduce the number of outgoing trips on Hope Street.

The defendants submitted evidence at trial that it would be impossible for two cars to pass each other on Hope Street when cars are parked on both sides of the street. This is already the case, however; First Step moving to Truman Street will not make the road narrower. By the defendants' own admission, Officer Hedge "[h]as not been alerted to any current traffic safety problems on Hope Street with the existing traffic, and parking on two sides of the street." (Def. Findings of Fact at ¶ 135.) The Zoning Commission also heard evidence that the additional traffic exiting onto Hope Street would not cause traffic problems. At the May 16, 2002 public hearing, Vliet stated that:

> On the remaining 150–foot section between Mountain Avenue and where we're going to have our driveway parking is allowed on both sides and admittedly it is tight, but again we're not proposing any significant amount of traffic where you would ever conceivably have some kind of traffic jam as a result

of cars wanting to go both ways. It's only 150 feet.

(Ex. 33 at 24.) Given the relatively light traffic First Step will generate, at most 75 cars exiting onto Hope Street during the course of the average weekday, the occurrence of impasses between cars attempting to pass each other in opposite directions on Hope Street would not significantly increase.

### First Step's Applications for Zoning Approval

The Truman Street site lies within the C–1 General Commercial District for zoning purposes. In order to qualify to use property within the C–1 zone, the intended use must match one of the permitted uses for C–1 property and the property owner must obtain a special use permit. Section 510 of the zoning regulations lists the permitted commercial and limited industrial uses of property in the C–1 zone. Section 810 defines the procedures and requirements for obtaining a special use permit. In evaluating applications for special use permits, the Zoning Board considers "the health, safety and welfare of the public, in general, and the immediate neighborhood, in particular, and may prescribe reasonable conditions and safeguards to insure the accomplishment of:" (1) harmony with the rest of the neighborhood and district, (2) the site plan objectives of Section 800B, particularly how the proposed development would affect traffic and whether it would pose a fire hazard, and (3) whether the proposed use would conform with all requirements of the district. (Ex. A at § 810B.)

On March 7, 2002, First Step applied for a special use permit and approval of its site development plan for the Truman Street under Section 510.2(34) of the Zoning Regulations.[3] Section 510.2(34) per-

3. The permitted use most analogous to First

Step's approved use at 38 Green Street is

mits use for educational establishments for learning disabled or mentally retarded adults, but excludes such use for adults with mental illness or drug or alcohol dependency:

> 34) Educational establishment for learning disabled or mentally retarded adults (but excluding adults with mental illness or drug or alcohol dependency) under license or contract with a state, federal, or municipal government agency.

At the same time, First Step also submitted a proposed amendment to subsection 34 to remove the prohibition on "educational establishments for adults with mental illness" in C–1 zoning districts. (Ex. 8; Ex. 10; Ex. 11.) First Step proposed the amendment as a request for a reasonable accommodation pursuant to the ADA and the Rehabilitation Act.

The Zoning Commission held a total of four public hearings on the First Step applications, on April 18, 2002; May 2, 2002; May 16, 2002; and June 20, 2002. First Step representatives generally spoke first, addressing issues raised by residents at the previous meetings. The remaining comments were fairly well split between persons supporting the First Step application and those opposing it. The majority of First Step support came from First Step clients, staff, members of the board of directors, or other management, although a minority of neighbors also supported the application. Comments opposing the First Step move raised concerns over safety due to the danger of First Step clients (Ex. 31 at 22, 53, 61, 67 ("[What] if there's someone I have to go and tell that family or get a phone call that one of your loved one[s] just was killed by somebody from First Step."), 77 ("I feel that that's a danger. The murders, the deaths associated with First Step are on the record."), 84; Ex. 32 at 55, 78, 91–92; Ex. 34 at 5, 7), First Step clients bringing drugs into the neighborhood (Ex. 31 at 23 ("When you deinstitutionalize people who should not be deinstitutionalized, they either fail to take their medication or they become duly diagnosed, they self-medicate with drugs or cocaine or some other illicit substance or alcohol."), 30 ("When you put a mentally disturbed, dually diagnosed crack abuser in society the drug dealers and the pimps come in and they take over."), 37 ("[T]here are approximately 50 active crack users among the clients")), traffic volume (Ex. 32 at 77, 95; Ex. 34 at 4, 26–28), and loitering by First Step clients in front of the building (Ex. 32 at 81). Other comments simply showed prejudice against the mentally ill. (Ex. 31 at 20, 23; Ex. 32 at 94–95 ("What does First Step have to offer us? . . . They won't bring more tax revenue, safer streets or enhance our neighborhood image. My concern is they will be taking everything we have worked so hard to regain, a self-image that will attract families and bring investors who shared a vision of a safe attractive place to live and work.").)

Prior to the second public hearing on First Step's application, held on May 2, 2002, Gillespie convinced First Step to add an alternative application for permit approval under Section 510.2(31)(e) as a "re-

---

Section 510(28):
> Institutions for higher learning, business, vocational, and training schools, including colleges, universities, junior colleges, business, banking, business management, secretarial and office service schools, computer and data processing schools, art and drafting schools, barber, beauty, and cosmetology schools, commercial or non-commercial food preparation schools, photography schools, schools for training in the martial arts, dancing, gymnastics, and music, schools for fashion design . . . .

habilitation" facility.[4] (Ex. 32 at 4 ("So I've spoken to the applicant. When the hearing is open on the special permit they are agreeable to amending their application to specifically state that they do fall under the rehabilitation facilities.").) Subsection 31 provides that a permitted use in C–1 zones is for:

31) Private, public, or quasi public rehabilitation facilities to include:

1) Outpatient, day treatment, or inpatient alcohol counseling, treatment, or rehabilitation clinics or centers;

2) Outpatient, day treatment, or inpatient drug counseling, treatment, or rehabilitation clinics or centers;

3) Outpatient, day treatment, or inpatient substance abuse counseling, treatment or rehabilitation clinics or centers;

4) Non-residential or residential halfway houses for current or former inmates of federal, state, or local correctional facilities; and

5) Other such similar outpatient or inpatient counseling, treatment, or rehabilitation clinics or centers that the Planning and Zoning Commission shall find to be substantively similar to the uses listed in Section 510.2(31), paragraphs (a) through (d) inclusive.

That any use identified within Section 510.2(31), paragraphs (a) through (e) inclusive shall be subject to the following restrictions and requirements:

1) That such uses shall obtain all appropriate licenses and permits required by Federal, State and Local laws, statutes and regulations within (1) year of the date of approval unless an extension of the time period is applied for by the applicant prior to the actual expiration date and granted by the Planning and Zoning Commission.

2) That such uses shall provide a minimum of 15 square feet of inside waiting or seating area space for each patron to be served within any one hour period of operation.

3) That such uses shall not be located within 500 feet of any nursery, elementary, or secondary school, college, university building or playground.

4) That such uses which provide residential services, either short term or long term, shall have a minimum of 70 square feet for the first resident and 50 square feet for each additional resident.

Section 510.2(34) of the Zoning Regulations does not contain any of the use restrictions of Section 510.2(31). At the time Gillespie encouraged First Step to amend its application, it was not clear whether the Truman Street site was within 500 feet of any schools or playgrounds, and thus whether First Step was actually eligible to apply under Section 510.2(31).[5]

**4.** First Step viewed its application under Section 510.2(31) as an alternative application, not an amendment of its application under Section 510.2(34). At the May 2, 2002 meeting, Keyes stated that:

It's not quite true that we say we are not an educational institution. What this letter asks is that our application be modified for the special permit to provide this commission with the opportunity of determining that section 410.231[sic] is a more appro-

priate section for us to go under than an amended section 510.234 that we had *originally applied under.* So it's a modification in the alternative.

(Ex. 32 at 9 (emphasis added).)

**5.** At the May 2, 2002 hearing, when one speaker argued: "Is this whole issue moot because under your zoning regulations, now that they've agreed . . . that they are a rehabilitation facility, they come closest to that, in the C1 zone they cannot be within 500 feet of

Based on testimony at trial, the court finds that the implicit message Gillespie relayed to First Step was that they were ineligible to apply under Section 510.2(34). (Gillespie test., Jan. 2, 2003 at 39–40 ("I informed them that the amendment was unnecessary, we had existing regulations in place that *would allow them to apply* for a permit for the Truman Street location.") (emphasis added).) Nevertheless, First Step pressed the amendment because First Step management believed the corporation was being discriminated against and because they believed that First Step was more accurately described as an educational institutional than a rehabilitation facility. (Keyes test., Jan. 2, 2003 at 135 ("[W]e thought it was discriminatory. I think it got our back up a little bit to see that up there and we thought it was discriminatory with our clients, and we thought that that was where we fit.").)

At the May 2, 2002 hearing, Gillespie addressed First Step's proposed amendment to Section 510.2(34), its request for a reasonable accommodation, and its willingness to submit an alternate application under Section 510.2(31). Gillespie stated that for purposes of its application for a special use permit, First Step should be considered a rehabilitation facility within the meaning of Section 510.2(31), rather than an educational establishment under Section 510.2(34), and noted First Step's willingness to amend its application. He then recommended that the Zoning Commission:

> vote to disapprove the regulation amendment [of Section 510.2(34)] as

submitted because it's unnecessary. We have already made reasonable accommodations in the existing regulations, so it's unnecessary, and that you acknowledge the fact that we have regulations that already deal with that.

(Ex. 32 at 5.) The Zoning Commission then unanimously rejected First Step's proposed amendment to Section 510.2(34) of the zoning regulations, finding that "[t]he proposal is redundant," and that, by telling First Step that it could apply for a special use permit under Section 510.2(31), "[t]he City has already made a reasonable accommodation under the current regulations." (Ex. 26 at 9.)

Peter Gillespie prepared the motion to grant First Step's special use permit under subsection 31, and attached a series of conditions to that motion. Those conditions were:

1. In order to ensure compliance with the Purpose and Intent of the City's Off–Street Parking Requirements and to specifically comply with the requirements of Section 614 E 2 (van/car pool regulations) First Step shall prepare and submit to the City Planner a more detailed plan and commitment to the proposed car pool program prior to the issuance of a building permit for this site.

2. Prior to the issuance of a Building Permit and per the requirements of the above referenced Section of the City of New London's Zoning Regulations, First Step shall prepare and submit to the Law Director for his

any nursery, elementary or secondary school, college, university or playground," Chairman Heap replied that "[o]ne of the reasons that we're going to pursue and not close the public hearing tonight is so our town planner can do measurements and let us know what's going on." (Ex. 32 at 53–54.) Keyes also testified that "at the time we were encouraged to

apply under [Section 510.2(31)] ... [n]o search had been done by anyone to see whether or not we fell under—whether or not there were any of these schools, secondary schools, colleges, primary schools, within 500 feet of the Truman Street site." (Keyes test., Jan. 2, 2003 at 184.)

review and approval a covenant which binds the tenants of this site to the van pool commitments made by First Step. First Step shall record this covenant on the New London land records prior to the issuance of a Certificate of Occupancy.

3. First Step shall prepare and distribute to its employees an employee parking policy that prohibits off-site, on-street parking in the immediate neighborhood. Failure to comply with the established land record covenant and parking policy may result in the revocation of the Special Use Permit.

4. In order to ensure the protection of the safety and welfare of the public, in general, and the immediate neighborhood in particular as per the requirements of Section 810 B Special Permit objectives, First Step shall prepare and submit to the City Planner a public safety plan and protocol to ensure the adequate protection of public safety. Such plan shall include but not be limited to security, staffing, qualifications, training, surveillance, parking lot lighting, etc. only as these items relate to on-site security. The City Planner shall consult with the New London Police Department prior to approval of said plan.

5. The site plans shall be revised to detail the proposed entrance and exit gates which shall include details to ensure access off-hours for public safety personnel. The details of such gates shall be submitted to City Public Safety Officials for review.

6. The site plans shall be revised to detail the perimeter fencing around the site.

7. The site plans shall be revised to reflect the one-way traffic pattern into and through the site which shall include a prohibition on traffic entering the site from Hope Street. These site [plan] revisions shall include modifications to the parking space layout, entrance/exit signs, pavement markings, etc. to be approved by the City Planner.

8. First Step shall request approval from the New London Police Department and Legal Traffic Authority of the creation of on-street dedicated handicapped accessible parking/loading spaces in front of 82–84 Truman Street so as to accommodate First Step's oversized vans. These vans may have difficulty being accommodated through the Truman Street driveway access.

9. First Step shall retain a qualified engineer to inspect and certify the structural integrity of the existing retaining wall located on the eastern side of the property line. If warranted, the City Planner in consultation with the City Engineer shall determine the level of necessary repairs.

10. A more detailed plan for the outdoor patio space shall be submitted for approval and First Step shall insure that its staff, visitors, and clients shall only congregate in the dedicated outdoor patio space and shall prohibit the loitering in front of 82–84 Truman Street.

11. Due to the unique parking waiver granted as a part of this application this permit is granted exclusively to First Step Inc. under the specific provisions of this application. Future occupancy of this building is subject to the grant of additional approval from the City of New London's Planning & Zoning Commission.

12. As proposed by the applicant First Step shall within sixty (60) days of the issuance of a Certificate of Occupancy to First Step at 82–84 Truman Street,

First Step shall vacate the current operations at 38 Green Street and consolidate operations at the new location.

13. A revised plan detailing the necessary site specific conditions attached to this approval shall be submitted to the Planning and Zoning Commission for approval and a building permit cannot be issued until said approval is granted.

(Ex. 30 at 3–5.) In an initial draft, Gillespie had also included a condition requiring First Step to submit a revised floor plan that would permit entrance into the building via one of the existing doorways on Truman Street. First Step rejected this condition, which Gillespie then removed.[6]

At the July 18, 2002 Zoning Commission meeting, Commission member Richard Parasiliti moved to approve First Step's application under Section 510.2(31), as drafted by Gillespie. Commission Member Mark Christiansen seconded that motion. The Zoning Commission denied First Step's application under Section 510.2(31) for a special use permit by a vote of five to one. Commissioner Richard Parasiliti voted in favor, and Commissioners Christiansen, Videll, Hersant, Butler, and Heap voted against the proposal. After the vote, Heap and Christiansen each offered three reasons for the denial. The Zoning Commission voted unanimously to adopt Heap and Christiansen's comments as the basis of the denial of First Step's application for a special use permit. Those reasons were:

1. Parking is an issue using the municipal lots in the downtown area is an intensification of what the City is striving to do in the downtown. With the development occurring in the downtown area there is an increased need for parking for customers and merchants.

2. There has been no specific plan presented as to how public safety will be handled and what means will be taken to protect the public.

3. There is a concern for the safety of consumers and staff of First Step walking up the driveway after they are dropped off in front of the building.

4. The testimony given by the residents of Mountain Avenue and Hope Street concerning the traffic coming out of the back entrance of Hope Street. When the Department of Motor Vehicles was located at the 82–84 Truman Street the site did not work the traffic was a problem and the parking was also problematic, as was the narrow driveway, as a result the DMV relocated. The proposed use by First Step is too intense for the site.

5. This site is not the proper site for the use intended the denial in no way is related to the clientele or the employees of First Step. Some of the neighbors came and spoke regarding the concerns of their neighborhood. Mr. Heap stated that he was most impressed with resident Will Ewing (who is a Special Education Teacher). Mr. Ewing expressed a concern for his neighborhood.[7]

---

6. Although Commission Member Butler made a motion at the July 18, 2002 meeting to amend the application, adding a condition requiring First Step to move the entrance to Truman Street, that motion was not seconded. The plan voted on by the Planning and Zoning Commission had the main entrance in the rear of the building.

7. At the April 18, 2002 hearing, Ms. Ewing read a letter from Mr. Ewing, stating in part that "[i]t also seems incompatible for all the children playing out here and all the new clients who would be hanging out here to co-exist in a healthy manner. Something will happen, trust me." (Ex. 31 at 55.) At the May 16, 2002 hearing, Mr. Ewing stated that

6. The traffic would be horrendous in the area and Hope Street cannot handle any additional traffic.

(Ex. 30 at 7.) Although the Zoning Commission unanimously denied First Step's proposed amendment to Section 510.2(34), and voted to deny First Step's application for a special use permit under Section 510.2(31), the Zoning Commission never voted to deny First Step's application under Section 510.2(34).

## ANALYSIS

### Standing

■ First Step and the individual plaintiffs have standing to bring claims under the ADA and the Rehabilitation Act. In *Innovative Health Systems v. City of White Plains*, 117 F.3d 37 (2d Cir.1997) [hereinafter *Innovative II*], the Second Circuit held that an alcohol and drug treatment center had the right to sue under the ADA and the Rehabilitation Act, even though it is not a person with a disability, because "the Rehabilitation Act extends its remedies to 'any person aggrieved' by the discrimination of a person on the basis of his or her disability." *Id.* at 47. First Step thus meets the prudential standing requirement, in addition to the injury-in-fact, causation, and redressibility requirements.

Because the failure to amend Section 510.2(34) of the Zoning Regulations did not give rise to the plaintiffs' injuries, plaintiffs lack standing to challenge the facially discriminatory provision of Section 510.2(34) of the Zoning Regulations under the Connecticut and United States Constitutions. Although Gillespie effectively terminated First Step's application under Section 510.2(34) before the Zoning Commission could vote on it, and although First Step considered its applications under Sections 510.2(31) and 510.2(34) to be separate applications, the Zoning Commission never voted to deny First Step's application under Section 510.2(34). More importantly, because the City of New London allowed First Step to apply for a special use permit under a separate provision, and applying under the separate provision did not affect the likelihood of success, First Step's application for a special use permit was not adversely affected by the facially discriminatory provision. (Gillespie test., Jan. 3, 2003 at 41 (once a party qualifies to apply for a special use permit, the same considerations are applied in determining whether or not to grant the permit).) Thus the

"if [First Step] comes to our neighborhood you're making a big mistake because you're going to ruin the lives of many, many people who live there, who fought hard over the past 20 years for a decent life." (Ex. 33 at 90.) He continued to explain that "New London does not want low income people living downtown.... [T]he mentally ill ... do not fit the upscale plans for the renaissance of that area." (Ex. 33 at 93.) "People downtown have plenty of stories to tell about clients loitering, plenty of First Step clients who loiter, smoke, urinate and murder." (Ex. 33 at 94.) At the June 20 hearing, Mr. Ewing stated that his concern is "you need security and you need to control the flow both in and out, then we need security as well for those of us who live in the vicinity that there may be a threatening situation and that you need secu-

rity .... My concern is if there isn't a dangerous situation, why is there security at all?" (Ex. 34 at 127–28.) Mr. Ewing also wrote at least one letter to the editor of a local paper, asking "[h]ow would you feel about a psychiatric facility moving into your residential neighborhood, with psychotics sharing your backyard and sidewalks with your children? ... Would anyone want this facility in his neighborhood knowing the mentally-disabled clients that First Step services will outnumber the residents?" (Ex. 25 at 4–5.) Although this is but a sample, Mr. Ewing's commentary was sufficiently rife with prejudicial statements that it is clear he had few, if any, reasons for opposing First Step's application that did not stem from the disabilities of First Step clients.

plaintiffs lack sufficient injury in fact to challenge Section 510.2(34) under the Equal Protection Clause. For the same reasons, plaintiffs cannot establish the discrimination element of its ADA and Rehabilitation Act claims solely on the grounds that the Zoning Commission's refusal to amend Section 510.2(34) constituted a refusal to make a reasonable accommodation.

### *ADA and Rehabilitation Act Claim*s

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2002). The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in [29 U.S.C. § 706(8) ], shall, solely by reason of her or his disability, be excluded form the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794 (2002).

 To establish a violation of Title II of the ADA, plaintiffs must show:

1. they are "qualified individuals with a disability";

2. they are being excluded from participation in or denied the benefits of some service, program, or activity by reason of their disability, or subjected to discrimination by reason of their disability; and

3. the entity which provides the service, program or activity is a public entity.

*Innovative Health Systems, Inc. v. City of White Plains*, 931 F.Supp. 222, 238 (S.D.N.Y.1996) (Barrington D. Parker, Jr., J.) [hereinafter *Innovative I* ]; *see also Tyler v. City of Manhattan*, 849 F.Supp. 1429, 1439 (D.Kan.1994). To establish a violation of the Rehabilitation Act, the plaintiffs must establish that:

(1) they are "individuals with disabilities" within the meaning of the Act;

(2) they are "otherwise qualified" to participate in the activity or program or to enjoy the services or benefits offered;

(3) they have been excluded from participation, denied benefits of, or subjected to discrimination under any program or activity solely by reason of their disabilities; and

(4) the entity denying plaintiffs' participation or enjoyment receives federal financial assistance.

*Innovative I*, 931 F.Supp. at 238.

As noted above, the parties have stipulated that (1) the City of New London receives federal financial assistance, and (2) "[f]or purposes of the ADA and Rehabilitation Act, each of the individual plaintiffs in this lawsuit is a person with a mental or psychiatric disability that substantially limits major life activities and is severe and persistent." [8] The public entity requirement is also met because the Second Circuit has held that the ADA and the Rehabilitation Act "clearly encompasses zoning decisions by the City because making such decisions is a normal function of a government entity." *Innovative II*, 117 F.3d at 44.

---

**8.** First Step also has standing to pursue a claim under Title II of the ADA because "the Rehabilitation Act extends its remedies to 'any person aggrieved' by the discrimination of a person on the basis of his or her disability." *Innovative II*, 117 F.3d at 47.

1. The "otherwise qualified" element of the Rehabilitation Act

 First Step and the individual plaintiffs are parties who are "otherwise qualified to enjoy the benefits of the activities of the [Zoning Commission], i.e., its investigations, reports and recommendations relating to the planning and development of the City." *Innovative I,* 931 F.Supp. at 238. First Step further argues that the issues the Zoning Commission raised regarding its site use plan, including traffic, parking, and proposed entrance, were merely pretextual and that prejudice was the Commission's primary motive in denying its application. Under the circumstances, the court finds that whether First Step was otherwise qualified to receive a special use permit is tied to the discrimination elements of the ADA and Rehabilitation Act. If the Zoning Commission was primarily motivated by bias against the psychiatrically disabled and the stated reasons for denying the application were but a pretext, the plaintiffs were otherwise qualified.

2. The discrimination elements of the ADA and the Rehabilitation Act

 Plaintiffs who allege violations of the ADA and the Rehabilitation Act may prove discrimination under any or all of three theories: intentional discrimination, disparate impact, and failure to make reasonable accommodation. *See Regional Economic Community Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 48 (2d Cir.2002) [hereinafter *Regional Economic Program* ]. While the plaintiffs have alleged discrimination under all three theories, the court did not hear evidence on disparate impact at the hearing January 2–3, 2003.

a. Intentional discrimination

 The Second Circuit analyzes claims of intentional discrimination under the ADA and the Rehabilitation Act using the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting analysis. *Regional Economic Program,* 294 F.3d at 48–49 ("We analyze claims of intentional discrimination under the FHA, the ADA, and the Rehabilitation Act under the familiar *McDonnell Douglas Corp. v. Green* burden-shifting analysis established for employment discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.").

Under the McDonnell Douglas test, the plaintiffs must first establish a prima facie case of discrimination. "To establish a prima facie case of discrimination under ... the ADA, the plaintiffs must present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive. To establish a prima facie case of discrimination under the Rehabilitation Act, by contrast, the plaintiffs must show that the defendants denied the permit 'solely' because of the disability." *Regional Economic Program,* 294 F.3d at 49 (citations and internal quotation marks omitted).

Plaintiffs in the present case have submitted strong evidence, both direct and indirect, of discrimination. As discussed above, Section 510.2(34) of the Zoning Regulations provides that educational facilities for learning disabled or mentally retarded adults may use property in C–1 zones, except for educational facilities that cater to persons with mental illness or drug or alcohol dependency. Although the defendants have attempted to shift blame for the language of this provision to the group that proposed it, the Zoning Commission ultimately had to approve the pro-

posed amendment. (Ex. A at § 1150 (requiring at least a majority vote of all members for the Commission to approve a proposed amendment)) In adopting this facially discriminatory language, the Zoning Commission made it the official policy of the City of New London to prevent educational facilities catering to the mentally ill from operating in C–1 zones. When asked to amend the provision, the Commission unanimously refused, reaffirming its policy of discrimination. In light of these strong, clear statements by the Zoning Commission that it does not want educational facilities catering to the mentally ill in C–1 zones, it would be difficult for the Commission to prove that, in fact, it had another, non-pretextual motive for denying First Step's application.

Because the plaintiffs must show that the defendants denied the permit "solely" because of the disability in order to make a prima facie case under the Rehabilitation Act, plaintiffs must also convincingly refute the six reasons offered by the Zoning Commission for its denial, reasons that were to varying degrees apparently non-discriminatory. As discussed above, upon denying First Step's application for a special use permit, the Zoning Commission adopted six reasons for doing so. This opinion will take them up in order.

 (1) Parking is an issue using the municipal lots in the downtown area is an intensification of what the City is striving to do in the downtown. With the development occurring in the downtown area there is an increased need for parking for customers and merchants.

■ Keyes testified that if First Step relocated to the Truman Street site, staff would continue using the same municipal lot that they currently use. Keyes test., Jan. 2, 2003 at 142 ("The majority of staff would be parking in the municipal parking lot which was about four-tenths of a mile away from the Truman Street site ... They [currently] park in the municipal parking lot, the same location."); Keyes test., Jan. 3, 2003 at 170–72. Demand for parking would not increase at the municipal lot on Green Street, nor at any other municipal lot. The Zoning Commission heard this same information on May 16, 2002. (Ex. 33 at 27 (First Step Attorney Pearson stated, "that's where they currently park." Defendant Heap replied, "[t]hey park there now.").)

 (2) There has been no specific plan presented as to how public safety will be handled and what means will be taken to protect the public.

■ The zoning regulations do not require applicants to submit a safety plan. To apply for a special use permit, an applicant must submit 13 copies of the materials and information requested in Section 800H to the Zoning Commission at least thirteen days in advance of the public hearing. (Ex. A at § 810C.) Section 800H requires that the applicant submit a location map; a topographical map; an open space and landscaping plan; a staging plan map; an environmental impact statement; an erosion and sediment control plan; as well as information on the applicant; proposed buildings and uses; easements; parking, loading, and circulation; signs and lighting; utilities; and hazardous materials and wastes. At no point does Section 800H suggest that an applicant must submit a "specific plan as to how public safety will be handled and what means will be taken to protect the public."

In the motion to approve First Step's application for a special use permit, the submission of a safety plan was included as condition 4. (Ex. 30 at 3 ("The application is hereby approved with the following con-

ditions/modifications: ... In order to ensure the protection of the safety and welfare of the public, in general, and the immediate neighborhood in particular as per the requirements of Section 810 B Special Permit objectives, First Step shall prepare and submit to the City Planner a public safety plan and protocol to ensure the adequate protection of public safety.")) First Step was not obligated to complete this requirement before the Zoning Commission conditionally approved the application. In light of the Zoning Commission's own proposal to allow First Step to submit a safety plan after it acted on the application, the Court finds that this second rationale for the vote is simply not credible. The Zoning Commission neither needed, nor did it expect, a First Step safety plan prior to the vote.

Perhaps more importantly, the Zoning Commission did not have a non-discriminatory reason for requiring a First Step safety plan. Although the defendants produced First Step's detailed safety records to demonstrate that First Step had an established safety problem (Ex. G at 42) (listing seventeen safety incidents, including four unspecified "vehicle issues," occurring at First Step during the first quarter of FY 2001); Ex. H at 42 (listing twenty safety incidents, including one "vehicle issue" described as an accident, during the second quarter of FY 2001); Ex. I at 42–43 (listing nineteen safety incidents, including two "vehicle issues" described as accidents, during the third quarter of FY 2001; Ex. J at 42 (listing 15 safety incidents, including four "vehicle issues" described · as accidents, during the fourth quarter of FY 2001); Ex. K at 50 (listing thirteen safety incidents, including two unspecified "vehicle issues" during the fourth quarter of FY 2002); Ex. S at 1–4 (incident reports); Ex. AA–DD (traffic projections)), the safety reports did not specify the seriousness of the incidents, and the

evidence at trial showed that many such incidents were merely unlocked cars, or similarly innocuous incidents.

The safety plan requirement reflects the misinformed and biased viewpoints of the majority of persons speaking at the public hearings. This court heard testimony, and more importantly, the Zoning Commission heard testimony that persons with mental disabilities are not a significantly greater threat to the community unless they are abusing drugs and alcohol. First Step does not permit the use of drugs or alcohol at its facilities. (Ex. 32 at 39 (Edward Samuel, President of the First Step Board of Directors stating that "[u]nder no circumstances are individuals under the influence of any substance allowed on site.")) If a First Step client has been using alcohol or drugs, the police are notified, and the person is transported to either the Southern Connecticut Alcohol and Drug Detention or Lawrence and Memorial Hospital. *Id.* ("If the person remains they are either transported to SCAG or an ambulance is summoned and the person is transported through L & M. These individuals are not just told to leave because they present a danger to themselves, they need help, but not at this facility."). The court finds that this fear for community safety, and the requirement, after the fact, that First Step submit a public safety plan, wholly arise from disabilities of First Steps' clients.

(3) There is a concern for the safety of consumers and staff of First Step walking up the driveway after they are dropped off in front of the building.

The concern over pedestrian safety was the only legitimate concern raised by the Zoning Commission. As the court noted at trial, however, there are reasonable measures First Step could take to mitigate

the potential hazard such as installing warning lights that would flash when pedestrians are in the driveway or adding an exit only door on Truman Street.

Additionally, the problem was largely the Zoning Commission's own creation. The city refused to permit First Step to drive its vans down the driveway from Truman Street and drop passengers off at the rear of the building. The city insisted that First Step drop passengers off in the front of the building, where they would have to walk down the driveway to the entrance at the rear of the building. In light of the court's finding below that the city failed to make a reasonable accommodation by refusing to allow First Step vans to use the driveway, and that the city must permit First Step to drive its vans down the driveway and drop passengers off in the rear of the building, the concerns over pedestrian safety will largely not come to fruition. Accordingly, the potential danger to pedestrians was largely a product of the city's own discriminatory behavior and, in light of the remedial safety precautions the Commission could have required, was insufficient to justify the denial of First Step's application.

 (4) The testimony given by the residents of Mountain Avenue and Hope Street concerning the traffic coming out of the back entrance of Hope Street. When the Department of Motor Vehicles was located at the 82–84 Truman Street the site did not work—the traffic was a problem and the parking was also problematic, as was the narrow driveway, as a result the DMV relocated. The proposed use by First Step is too intense for the site.

 As discussed above, relative to nearly any other use of the Truman Street site, the traffic generated by First Step would be quite light. Adding only 75 round trips to the property on weekdays,

First Step's use would have "[n]o measurable impact ... to the adjacent roadway system," according to Vliet. (Ex. 14 at 2.) "Roadway conditions will continue to provide safe and efficient travel operations." *Id.*

 (5) This site is not the proper site for the use intended the denial in no way is related to the clientele or the employees of First Step. Some of the neighbors came and spoke regarding the concerns of their neighborhood. Mr. Heap stated that he was most impressed with resident Will Ewing (who is a Special Education Teacher). Mr. Ewing expressed a concern for his neighborhood.

 The court finds that this reason is a thinly veiled adoption of the community's prejudice against the mentally ill. As discussed above, the majority of the neighbors' comments at the public hearing, including Mr. Ewing's, expressed a will to not have First Step relocate to Truman Street because its clients have psychiatric disabilities. Among his other prejudicial comments at the public hearing, Mr. Ewing stated that "New London does not want low income people living downtown. . . . [T]he mentally ill ... do not fit the upscale plans for the renaissance of that area." (Ex. 33 at 93.) In published letters to the editor, Mr. Ewing has also referred to First Step clients as "psychotics." (Ex. 24 at 4–5.) Despite the Zoning Commission's disclaimer, this fifth reason is an inartful but clear adoption of the community's prejudice and articulation of the Zoning Commission's discrimination against the plaintiffs due to their psychological disabilities.

 (6) The traffic would be horrendous in the area and Hope Street cannot handle any additional traffic.

As discussed above under the fourth reason, which also raised traffic concerns,

the evidence before the Commission was that the additional traffic generated by First Step would be light, and would not undermine safety on surrounding roads. The additional traffic generated would be much lighter than that generated by the DMV office that previously occupied the site. It would also be less than that generated by nearly any other potential use of the building. The court finds that this sixth reason, like the fourth is wholly pretextual.

Because First Step has established a prima facie case of intentional discrimination, and can rebut the pretextual reasons given by the Zoning Board for its decision, the court concludes that the defendants denied the permit "solely" because of the disability. Ordinarily, once the plaintiffs have made a prima facie case, the burden would shift to the defendants to show a legitimate non-discriminatory reason for their actions. *Regional Economic Program*, 294 F.3d at 49 ("If the plaintiffs make out a prima facie case, then the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their decision.") (citations and internal quotation marks omitted). However, the plaintiffs have already rebutted the defendants pretextual reasons for the denial in showing that discrimination was the sole motivating factor. The court therefore concludes that the plaintiffs have established that the defendants discriminated on the basis of a disability within the meaning of the ADA and the Rehabilitation Act.

#### b. Reasonable accommodation

■ Under both the ADA and the Rehabilitation Act, public entities and entities receiving federal financial assistance must make reasonable accommodations in their rules, policies and practices when necessary to avoid discriminating against a person on the basis of a disability. *Id.* at *15 ("The ADA and the Rehabilitation Act ... require[ ] that covered entities make reasonable accommodations in order to provide qualified individuals with an equal opportunity to receive benefits from or to participate in programs run by such entities."); *id.* at *38 ("A municipality discriminates in violation of the FHA, the ADA, or the Rehabilitation Act if it refuses to make changes to traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling.") (citations and internal quotation marks omitted); *Innovative I,* 931 F.Supp. at 239 ("Under the ADA and Rehabilitation Act, public entities and entities receiving federal financial assistance are required to make 'reasonable modifications' or 'reasonable accommodations' in their rules, policies and practices when necessary to avoid discrimination.") (citations omitted).

■ An accommodation is reasonable if it neither "imposes undue financial and administrative burdens" nor "requires a fundamental alteration in the nature of [the] program." *School Board v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (citations omitted); *see also Innovative I,* 931 F.Supp. at 239 ("An accommodation is reasonable if it does not cause any undue hardship or fiscal or administrative burdens on the municipality, or does not undermine the basic purpose that the zoning ordinance seeks to achieve.") (citations omitted); *Tsombanidis v. City of W. Haven,* 180 F.Supp.2d 262, 292 (D.Conn.2001) (Goettel, J.) ("Additionally, the regulations promulgated under Title II of the ADA mandate a reasonable *modification* by a public entity in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that

making the modifications would fundamentally alter the nature of the service, program, or activity.") (citation and internal quotation marks omitted); *Oxford House, Inc. v. Babylon,* 819 F.Supp. 1179, 1186 (E.D.N.Y.1993) ("An accommodation is reasonable under the FHA if it does not cause any undue hardship or fiscal or administrative burdens on the municipality, or does not undermine the basic purpose that the zoning ordinance seeks to achieve."). In *Regional Economic Community Action Program, Inc. v. City of Middletown,* the Second Circuit provided an example of a reasonable accommodation:

> Returning to the example of the zoning ordinance prohibiting elevators, a proper reasonable accommodation claim might assert that the zoning authority should have waived or modified its rule against elevators in residential dwellings to permit those who need them to use them and thereby have full access to and enjoyment of residences there.

294 F.3d at 53 (citations and internal quotation marks omitted).

■ First Step established that its clients depend on its services and would otherwise have great difficulty functioning effectively in the community. First Step also established that many of its clients could not attend programs if First Step did not provide transportation in its vans. Nonetheless, the Zoning Commission refused to agree to allow First Step to drive its vans down the driveway at the Truman Street site, allegedly because the driveway was too narrow for the vans. While the driveway is narrow, even at its narrowest point it is wide enough for the vans to pass with several inches to spare on either side. Because permitting this use of the vans would neither impose any cost on New London nor undermine its regulatory scheme, the Zoning Commission was obli-

gated under the ADA and the Rehabilitation Act to do so. Its refusal to do so demonstrates discrimination on the basis of a disability within the meaning of both acts.

■ The Zoning Commission was also obligated to make a reasonable accommodation for First Step with respect to pedestrian traffic on the driveway of the Truman Street site. The defendants should have worked with First Step to find means of mitigating potential safety concerns. Such efforts should have extended beyond requiring First Step to locate its entrance on Truman Street. As the court has noted, other measures such as warning lights or an exit only door on Truman Street could have alleviated the defendants' concerns. The decision to deny First Step's application on this ground constitutes a failure to provide reasonable accommodation, because the city could have granted the application at no cost to itself and without jeopardizing pedestrian safety. Although the court has already found that the Zoning Commission's concerns over parking, additional traffic on Hope Street, and public safety were wholly pretextual, the Zoning Commission was similarly obligated to make reasonable accommodations for First Step on these issues.

### Section 1983 and Connecticut Constitutional Claim

The plaintiffs argue that the defendants, through their actions and through the facially discriminatory zoning provision, have also violated the Equal Protection Clause of the United States Constitution and Amendment XXI to the Connecticut Constitution. As discussed above, the plaintiffs lack standing to bring a facial challenge to Section 510.2(34). In light of the Court's holdings on the Plaintiffs' ADA and Rehabilitation Act claims, the Court

chooses not to reach the merits of the Plaintiffs' argument that the defendants' have violated the plaintiffs' constitutional rights through the unequal application of the city's zoning laws. Having prevailed on their ADA and Rehabilitation Act claims, the plaintiffs have sufficient grounds for obtaining the desired injunctive relief.

## INJUNCTIVE RELIEF

█ Plaintiffs seek a permanent injunction (1) restraining the defendant City of New London from taking any action that would directly or indirectly interfere in any way with the redevelopment and occupancy by the plaintiffs of 82 Truman Street as an educational facility to assist people with mental disabilities; and (2) granting First Step's special use permit applications, or waiving the requirement of such permits.

To obtain a permanent injunction after having succeeded on the merits, a party must show that irreparable harm is likely, the inadequacy of any remedy at law, and that the balance of equities favors injunctive relief. In the present case, the plaintiffs have succeeded on the merits, and monetary relief would not assist them in gaining zoning approval for a new facility in the City of New London. Balancing the equities also favors granting injunctive relief. The public interest in preventing discrimination against the disabled would outweigh the City of New London's interest in the uniform application of its zoning laws, even if that had been the city's objective.

█ The plaintiffs have also shown irreparable harm. "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs.,* 60 F.3d at 37 (internal quotation marks omitted). The plaintiffs have established irreparable harm through evidence that, because First Step has been prevented from moving to an adequate facility, its clients are being deprived of programs and services. In *Innovative II,* the Second Circuit found that affidavits from doctors and patients at an alcohol and drug treatment center stating that patients would not attend therapy sessions and the center would not be able to provide vocational therapy unless the center could move to a larger facility were sufficient to prove irreparable harm. 117 F.3d at 44 ("The affidavits do not merely assert minor inconveniences, as the City characterizes them, but rather set forth a real need for the proposed relocation and the serious risks of harm to specific persons without it."). In the present case, Benson testified at trial that she and other clients sometimes do not go to First Step or participate in First Step programs because the current building is too small to accommodate all clients and all needed services. Benson and Smith testified that they have difficulty getting upstairs at the Green Street site because the building is not handicapped accessible, and that the lack of space hinders privacy and limits the quality and types of programs First Step offers. Smith testified that, if she did not attend First Step programs, she would be more likely to harm herself. In light of the plaintiffs' showing of real need for the proposed relocation and the serious risk of harm to specific persons without it, the court finds that deprivation of First Step programs and services caused plaintiffs irreparable harm.

The plaintiffs have also established irreparable harm through evidence that First Step is being denied the ability to pursue its mission. By hindering First Step's attempts to relocate to a building that is handicapped accessible and that would better accommodate the programs First Step sought to offer, the defendants

are preventing First Step from serving some clients and diminishing the quality and variety of First Step's programs, undermining First Step's purpose of "educating and assisting individuals with disabilities to achieve independence and integrate into the larger community." (Pl.Ex. 1.) A monetary award would not adequately compensate First Step for these injuries. The court therefore finds that the denial of First Step's ability to pursue its mission constitutes rise to irreparable harm. *See Stewart B. McKinney Foundation, Inc. v. Town Plan & Zoning Comm.*, 790 F.Supp. 1197, 1209 (D.Conn.1992) ("Monetary damages would not adequately compensate the plaintiff for its inability to achieve its purpose of providing housing in the Oldfield property to needy HIV-infected persons pending a final determination of this action. Therefore, the plaintiff would suffer irreparable harm if a preliminary injunction did not issue.").

Because the plaintiffs have succeeded on the merits of their ADA and Rehabilitation Act claims, and because they can show the inadequacy of any remedy at law, that they have suffered irreparable damages, and that the balance of equities favors injunctive relief, plaintiffs are entitled to injunctive relief.

Accordingly, IT IS HEREBY ORDERED that:

1. On the basis of the foregoing findings, First Step is hereby granted zoning approval for its new building at 82–84 Truman Street, effective immediately. This order shall be final for purposes of any state bonding application deadlines, but may be superseded by the final special use permit to be granted by defendants, as set out below.

2. The defendants shall issue a final special use permit to First Step for the proposed use at 82–84 Truman Street, in substantially the form set out in the proposed motion to Zoning Commission on July 18, 2002, but with the following modifications:

(a) Condition 4, requiring a "public safety plan," is eliminated;

(b) Condition 7, requiring a one-way traffic pattern, is modified to permit entry into the Hope Street entrance by First Step's two 15–passenger vans, so long as that use does not substantially exceed the representations made to the Zoning Commission by First Step regarding the timing and frequency of trips;

(c) Condition 8, requiring the "creation of on-street dedicated handicapped accessible parking/loading spaces in front of 82–84 Truman Street," is eliminated. First Step vans will drop off staff and clients behind the building, in the rear parking lot.

(d) Condition 10, requiring First Step to submit a more detailed plan of the proposed outdoor patio and "prohibit the loitering in front of 82–84 Truman Street," is eliminated.

(e) Condition 12, requiring First Step to vacate its current facility at 38 Green Street "within sixty (60) days of the issuance of a Certificate of Occupancy," is eliminated.

3. The remaining conditions in the special use permit shall be complied with by the applicant as soon as practicable, and the city shall promptly grant the final special use permit without additional conditions, unreasonable or overly stringent interpretation of provisions of the zoning regulations or other undue delay.

4. This order is judicially enforceable, and the court shall retain jurisdiction to monitor implementation of and to enforce this order.

5. Plaintiffs shall recover their costs of this action, and may file a motion for an award of attorneys' fees and expenses.